FINAL REDACTED VERSION

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS
## (BID PROTEST)

|  |  |  |
|---|---|---|
| SAVANTAGE FINANCIAL SERVICES, INC., | ) ) ) ) | |
| *Plaintiff,* | ) ) | |
| v. | ) ) | Case No. 21-1910 |
| | ) | Judge Charles F. Lettow |
| THE UNITED STATES, | ) ) | **(FILED UNDER SEAL)** |
| *Defendant,* | ) ) | |
| and | ) ) | |
| CGI FEDERAL, INC., and MYTHICS, INC., | ) ) ) | |
| *Defendant-Intervenors.* | ) ) | |

## DEFENDANT-INTERVENOR MYTHICS, INC.'s CROSS-MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD AND RESPONSE TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE RECORD

Dated: December 21, 2021

Of Counsel:

Gregory R. Hallmark, Esq.
Amy L. Fuentes, Esq.
1650 Tysons Boulevard, Suite 1700
Tysons, VA 22102
Email: gregory.hallmark@hklaw.com
Email: amy.fuentes@hklaw.com

Hillary J. Freund, Esq.
Holland & Knight LLP
800 17th Street, N.W., Suite 1100
Washington, D.C. 20006
Email: hillary.freund@hklaw.com

Submitted By:

HOLLAND & KNIGHT LLP

David S. Black, Esq.
(Counsel of Record)
1650 Tysons Boulevard, Suite 1700
Tysons, VA 22102
Phone: (703) 720-8680
Fax: (703) 720-8610
Email: david.black@hklaw.com

*Counsel for Mythics, Inc.*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................III

INTRODUCTION ..................................................................................................1

QUESTIONS PRESENTED ......................................................................................4

STATEMENT OF THE CASE ...................................................................................5

I.     The Solicitation ...................................................................................5

II.    Evaluation Factors and Basis of Award ...........................................6

III.    Amendments and Proposal Submissions .........................................9

IV.    Award Decision ...............................................................................11

STANDARD OF REVIEW ....................................................................................12

ARGUMENT .......................................................................................................14

I.    The Agency's Procurement Procedure was in Accordance with the FAR and the Solicitation and Savantage was not Prejudiced ...........................................................14

    A.    Mythics' Nov. 2, 2020 Response to Amendment 5 ..................................14

        1.    Background .......................................................................................15
        2.    The Late-is-Late Rule Does Not Apply ..................................................22
        3.    Even if the Late-Is-Late Rule Applied, Savantage was Not Prejudiced Because the Late Submission was Rendered Moot by Subsequent Corrective Action, Discussions, and Proposal Revisions ...........................................................32

    B.    Price Reasonableness ....................................................................35

        1.    Evaluation of Overall Price ...................................................................36
        2.    Competitive Published Price Lists ..........................................................37

    C.    The Agency Reasonably Evaluated Savantage's Proposal Under Factor 2, Functional Capability in Accordance with the Solicitation .......................................42

    D.    The Agency Fairly Applied the Same Evaluation Criteria to All Offerors Under Factor 2 ..........................................................................................45

    E.    The Agency's Evaluation of Savantage's Proposal Under Factor 2 was Based on a Plain Reading of Savantage's Proposal ...........................................................48

        1.    The Agency's Conclusion that Savantage's Modules ██████████████ Was Reasonable ................................................................................49
        2.    The Agency's Conclusion that Savantage's Software Modules ██ ██ " ████ Was Rational ...............49

3.   The Agency Rationally Concluded that the Connections Between Savantage's Software Solutions ███████████████████ ..................................................................50

F.   The Agency's Evaluation of Offerors' Proposal under Factor 1, Experience was Reasonable and in Accordance with the Solicitation ................................52

G.   The Agency's Evaluation Under Factor 4, Past Performance was Reasonable and in Accordance with the Solicitation .....................................................54

H.   Best Value Determination ............................................................................56

II.   Plaintiff Is Not Entitled to Any Injunctive Relief ...........................................58

CONCLUSION....................................................................................................................58

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*A & D Fire Prot., Inc. v. United States,*
  72 Fed. Cl. 126 (2006) .......................................................................................... 12

*Axiom Resource Mgmt., Inc. v. United States,*
  564 F.3d 1374 (Fed. Cir. 2009) ........................................................................... 41

*Bahrain Mar. & Mercantile Int'l BSC (C) v. United States,*
  118 Fed. Cl. 462 (2014) ....................................................................................... 12

*Banknote Corp. of Am. v. United States,*
  56 Fed. Cl. 377 (2003), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004) ........................ 13, 42

*Bannum, Inc. v. United States,*
  404 F.3d 1346 (Fed. Cir. 2005) ....................................................................... 12, 13

*Blue & Gold Fleet, L.P. v. United States,*
  492 F.3d 1308 (2007) ........................................................................................... 40

*Carahsoft Tech. Corp. v. United States,*
  86 Fed. Cl. 325 (2009) ......................................................................................... 33

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
  401 U.S. 402 (1971) ............................................................................................. 13

*Crowley Tech. Mgmt., Inc. v. United States,*
  123 Fed. Cl. 253 (2015) ....................................................................................... 58

*DynCorp Int'l LLC v. United States,*
  148 Fed. Cl. 568 (Fed. Cir. 2020) ....................................................................... 13

*DynCorp Int'l LLC v. United States,*
  76 Fed. Cl. 528 (2007) ......................................................................................... 29

*DynCorp Int'l, LLC v. United States,*
  10 F.4th 1300 (Fed. Cir. 2021) ................................................................. 14, 35, 38

*E.W. Bliss Co. v. United States,*
  77 F.3d 445 (Fed. Cir. 1996) ............................................................................... 50

*Electronic On-Ramp, Inc. v. United States*,
    104 Fed. Cl. 151 (2012) ................................................................................... 23

*Enhanced Veterans Sols., Inc. v. United States*,
    131 Fed. Cl. 565 (2017) ................................................................................... 54

*Geo-Seis Helicopters, Inc. v United States*,
    77 Fed. Cl. 633 (2007) ............................................................................... 30, 32

*Glenn Def. Marine (ASIA), PTE Ltd. v. United States*,
    720 F.3d 901 (Fed. Cir. 2013) .................................................................... 13, 35

*Guardian Moving & Storage Co. v. United States*,
    122 Fed. Cl. 117 (2015) ................................................................................... 33

*IAP World Servs., Inc. v. United States*,
    153 Fed. Cl. 564 (2021) ................................................................................... 38

*Kinemetrics, Inc. v. United States*,
    No. 21-1626, 2021 WL 4237169 (Fed. Cl. Sept. 10, 2021) .............................. 48

*Latecoere Int'l, Inc. v. U.S. Dep't of the Navy*,
    19 F.3d 1342 (11th Cir. 1994) ......................................................................... 13

*Lawson Envt'l Servs., LLC v. United States*,
    126 Fed. Cl. 233 (2016) ................................................................................... 29

*Lockheed Missiles & Space Co. v. Bentsen*,
    4 F.3d 955 (Fed. Cir. 1993) ............................................................................. 50

*National Air Cargo Group, Inc. v. United States*,
    127 Fed. Cl. 707 (2016) ................................................................................... 31

*Office Design Grp. v. United States*,
    951 F.3d 1366 (Fed. Cir. 2020) ...................................................... 12, 46, 53, 54

*PGBA, LLC v. United States*,
    389 F.3d 1219 (Fed. Cir. 2004) ....................................................................... 58

*Red Cedar Harmonia, LLC v. United States*,
    144 Fed. Cl. 11 (2019) ..................................................................................... 48

*Safeguard Base Operations, LLC v. United States,*
    989 F.3d 1326 (Fed. Cir. 2021)................................................................. 23

*Savantage Fin. Servs., Inc. v. United States,*
    595 F.3d 1282 (Fed. Cir. 2010)........................................................... 1, 45

*Savantage Financial Servs., Inc. v. United States,*
    150 Fed. Cl. 307 (2020) ............................................................................ 1

*Software Eng'g Servs., Corp. v. United States,*
    85 Fed. Cl. 547 (2009) ............................................................................ 52

*Squire Sols., Inc. v. United States,*
    No. 21-1494C, 2021 WL 4805540 (Fed. Cl. Sept. 30, 2021) .................. 48

*United Enter. & Assocs. v. United States,*
    70 Fed. Cl. 1 (2006) ............................................................................... 52

*Vectrus Sys. Corp. v. United States,*
    154 Fed. Cl. 29 (2021) ........................................................................... 38

*WaveLink, Inc. v. United States,*
    154 Fed. Cl. 245 (2021) ......................................................................... 29

*WIT Assocs., Inc. v. United States,* 122 Fed. Cl. 1 (2015),
    *aff'd*, 668 Fed. Appx. 365, 2016 WL 4363179 (Fed. Cir. Aug. 16, 2016) .............................. 31

**Statutes**

5 U.S.C. § 706................................................................................................. 14

Pub. L. 115–232, 132 Stat. 1917 (Aug. 13, 2018) ................................. passim

**Administrative Decisions**

*Chags Health Info. Tech., LLC,*
    B-413104.30, 2019 WL 1858368 (Comp. Gen. April 11, 2019)................. 25, 28, 29

*Charter Environmental, Inc.,*
    B-297219, 2005 WL 3288200 (Comp. Gen. Dec. 5, 2005)..................... 28

*Coast Int'l Sec., Inc.,*
    B-411756, 2015 WL 7348949 (Comp. Gen. Oct. 19, 2015) ................... 29

*JRS Staffing Servs.*,
  B-409360, 2014 WL 1266138 (Comp. Gen. March 27, 2014) ................................................. 28

*McCann-Erickson USA, Inc.*,
  B-414787, 2017 WL 4385965 (Comp. Gen. Sept. 18, 2017) ................................................. 27

*Veterans Constr. of S.C., LLC*,
  B-401723.2, 2010 WL 236827 (Comp. Gen. Jan. 21, 2010) ................................................. 27

**Regulations**

FAR 14.405 ................................................................................................ 23, 24, 25

FAR 15.404-1 .............................................................................................. 37, 38, 39, 40

FAR 52.204-24 .................................................................................................... passim

FAR 52.204-25 .................................................................................................... passim

FAR 52.204-26 .................................................................................................... passim

FAR 52.209-2 ............................................................................................................. 26

FAR 52.212-1 ........................................................................................................ 23, 30, 35

FAR 9.103 ................................................................................................................. 26

FAR 9.104-1 .............................................................................................................. 26

FAR 9.108 ................................................................................................................. 26

**Regulatory Rulemaking**

84 Fed. Reg. 40216 (Aug. 13, 2019) ...................................................................... 17, 18

84 Fed. Reg. 68314 (Dec. 13, 2019) ............................................................................. 18

85 Fed. Reg. 42665 (July 14, 2020) .............................................................. 16, 19, 20, 27

85 Fed. Reg. 53126 (Aug. 27, 2020) .............................................................................. 20

Pursuant to the Court's November 15, 2021, Scheduling Order and Rule 52.1(c) of this Court, Defendant-Intervenor Mythics, Inc. ("Mythics" or the "Intervenor") respectfully requests that the Court grant judgment based upon the administrative record in favor of the U.S. Department of Homeland Security ("DHS" or the "Agency") for the reasons discussed below and deny Plaintiff Savantage Financial Services, Inc.'s ("Savantage" or "Plaintiff") Motion for Judgment on the Administrative Record[1] and its request for declaratory and injunctive relief.

## <u>INTRODUCTION</u>

Savantage has a fundamental problem it has been trying to solve through the protest process rather than improvement of its own technology for the past 15 years.  Savantage offers outdated financial management software that is not integrated with other enterprise-level software solutions DHS has determined it needs and are available elsewhere in the marketplace. Savantage has filed numerous protests seeking to block DHS's decision to modernize its systems by procuring commercial-off-the-shelf integrated financial, procurement, and asset management software.  *See, e.g.*, *Savantage Financial Servs., Inc. v. United States*, 150 Fed. Cl. 307 (2020) (challenging DHS's evaluation criteria regarding whether integrated software has been implemented at other agencies); *Savantage Financial Servs., Inc. v. United States*, 595 F.3d 1282 (Fed. Cir. 2020) (challenging DHS's requirement for an integrated software system).  Not surprisingly, Savantage's lack of proven technology that offers integrated financial, procurement, and asset management software is a major reason why it was not recognized as a "best value"

---

[1] "Pl. MJAR at __" refers to pages in Plaintiff's Motion for Judgment on the Administrative Record filed on November 30, 2021, ECF No. 45.  "Tab __ at AR__" refers to pages in the Administrative Record filed on October 12, 2021, ECF No. 26.

offeror in this procurement.  Rather than accept its shortcomings and invest in more competitive technology, Savantage is again resorting to the protest process to ask the Court to second guess DHS's patient, well-reasoned judgment.

As demonstrated below, Savantage's claims that its protest is "simple," involves alleged mistakes that "strike at the heart of procurement law," and "implicate[s] national security" (Pl. MJAR at 1) quickly evaporate upon examination of the Administrative Record.  Instead, Savantage *over*simplifies many of the issues it raises by presenting an incomplete picture or contorting the Solicitation beyond recognition.  Where it tries to spin fundamental procurement violations, it merely cobbles together a string of waivable informalities, decisions soundly with the Agency's discretion, and a string of sour grapes disagreements with DHS's evaluation judgment.  Savantage's claim that its protest implicates national security is easily revealed to be a case of Savantage trying to turn a molehill into a mountain.  Specifically, Savantage's protest must be rejected for the following reasons:

*First*, Savantage seeks to mask a series of issues appropriately treated by the Agency as waivable informalities (representations related to a responsibility issue, the extension of proposals, and the signed acknowledgment of a solicitation amendment) as proposal "revisions" or "modifications" subject to the "late-is-late" rule.  As set forth herein, the Agency acted well within its discretion to waive minor informalities of Mythics and Carasoft in the presentation of this information, and this informality occurring in November 2020 was overtaken by events when the Agency re-opened the competition following a series of protests in the spring and summer of 2021—events not addressed by Savantage in its opening brief.

*Second*, Savantage attempts to undermine the Agency's price reasonableness evaluation by asserting the Agency did not analyze total evaluated prices when it clearly did and by asserting the Solicitation prescribed a specific technique for analyzing unit prices, when it clearly did not.  Instead, the Administrative Record shows that the Agency's price evaluation was consistent with the Solicitation, utilized techniques well within its discretion, and was reasonable.

*Third*, Savantage attempts to deflect blame for its own technological failing by challenging the Agency's 20-page explanation under Factor 2 (Functional Capability) of why Savantage did not offer financial management, procurement, and asset management software that was ████████ by raising meritless arguments that the Agency applied unstated evaluation criteria or, alternatively, applied an unequal evaluation standard to other competitors.  The Administrative Record easily refutes these arguments by showing the Agency's evaluation rested on real and material differences between the ████████ software offered by Mythics, CGI Federal, and Carasoft and the patchwork technology offered by Savantage.

*Fourth*, Savantage attempts a similar unequal treatment gimmick in its challenge of the Agency's evaluation under Factor 1 (Experience) and Factor 4 (Past Performance).  Again, Savantage's arguments are exposed to be mere disagreements with reasonable Agency judgments that rest squarely on real differences between the experience and past performance of the three awardees and Savantage.

*Fifth*, Savantage's attempt to challenge the best value determinations of the Agency likewise fail.  The Administrative Record shows that the Agency reasonably selected Carasoft for award because it was ████████████████████ than Savantage.  Furthermore, the

████████████████████████████████████

████████████████████████████

Agency reasonable identified ████████ in the areas of ████████████████ in the proposals of Mythics and CGI Federal that ██████████████ Savantage.  Savantage resorts to an desperate argument that the Agency was required to conduct tradeoff analyses *among the awardees*, themselves—something that finds no support in the Solicitation or applicable procurement law.

In short, Savantage's attempts to recast its own competitive shortcomings as a series of unconvincing procurement errors must fail.  Mythics respectfully requests that the Court grant its motion for judgment on the administrative record and deny Savantages's motion.

## QUESTIONS PRESENTED

1.  Whether DHS acted within its discretion to waive minor informalities or irregularities in awardees' responses to a solicitation amendment, and whether Savantage was prejudiced even if the late-is-late rule applied to that response.

2.  Whether DHS acted within its discretion when conducting price reasonableness analyses.

3.  Whether the Agency's Factor 2 assessment concerning the "integration" of all offerors' financial, management and acquisition software and Savantage's functional capabilities under Factor 2 were arbitrary and capricious or otherwise inconsistent with law or regulation.

4.  Whether DHS's evaluation of Experience under Factor 1 and Past Performance under Factor 4 was arbitrary and capricious or other inconsistent with law or regulation.

5.  Whether the RFP precluded DHS from selecting the best value proposals for award instead of Savantage.

**STATEMENT OF THE CASE**

**I.    The Solicitation**

On October 30, 2019, the Agency issued Request for Proposal No.
70RTAC20R00000001 ("RFP" or the "Solicitation) seeking Enterprise Financial Management
Systems ("EFiMS") software.  (*See* Tab 24 at AR5374.)

As explained by the Solicitation, DHS Components currently rely on "various platforms,
tools, and applications to perform functions related to financial, procurement, and asset
management" and therefore each DHS Component "varies in its integration capabilities and
compliance standards developed by DHS."  (Tab 27d at AR6383.)  Problematically, when a DHS
Component is able to meet DHS standards/requirements, they often do so through "customized
automated or manual processes that are expensive to maintain" and some DHS Components use
legacy non-integrated technology that "requires manual processes which leads to inconsistent
data and reporting."  (*Id.*)  Accordingly, through this Solicitation, DHS sought to "enable
streamlining and standardization of DHS systems for current and future needs."  (*Id.*)  To this
end, the Solicitation sought to award multiple Indefinite-Delivery, Indefinite-Quantity ("IDIQ")
contracts to provide DHS and its components with commercial-off-the-shelf ("COTS")
***integrated financial, procurement, and asset-management software*** licenses (perpetual
licenses/annual maintenance, subscription licenses), software-as-a-service ("SaaS"), software
documentation and accessory products (only if incorporated into the proposed software), and tier
4 consultative services.  (*See* Tab 68 at AR9931.)

The Solicitation explained that the goal was to have all DHS Components on standard
business processes with the intent to "minimize cost, improve efficiency, ensure data quality and

5

strengthen internal controls."  (Tab 27d at AR6382.)  The Solicitation required the proposed

software to support the following "key success factors": (1) ***integrated*** financial procurement and

asset management system(s), (2) timely and accurate financial reporting, (3) sustainment,

effectiveness, and performance, (4) scalability for future needs, and (5) the ability to address

security risks and ensure auditability.  (*See id.* at AR6382-83 (emphasis added).)

As pertinent here, the Solicitation defined "integrated" as a:

> Connection between two or more software modules, typically part
> of the same system.  Connectivity is transparent to end users and
> maintained as part of a software offering.  The system is considered
> tightly coupled.  There is no software development required to build
> these connections and they do not require operations and
> maintenance support under a sustainment contract.  Updates are
> provided by the OEM vendor.

(*Id.* at AR6412.)

As also relevant here, the initial RFP dated October 30, 2019 included the then-current

version of the Federal Acquisition Regulation ("FAR") clause 52.204-25, Prohibition on

Contracting for Certain Telecommunications and Video Surveillance Services or Equipment

(Tab 24b at AR5432) and required offerors to make a representation in the then-current version

of FAR 52.204-24, Representation Regarding Certain Telecommunications and Video

Surveillance Services or Equipment (Aug 2019).  (*Id.* at AR5451-42.)

## II.     Evaluation Factors and Basis of Award

The Solicitation called for DHS to make awards to offerors whose proposals are

"determined to represent the best value, price and non-price factors considered."  (Tab 68 at

AR10028.)  The Solicitation called for the consideration of six evaluation factors:

Factor 1: Experience

Factor 2: Functional Capability
Factor 3: License Terms & Conditions and Security Overview
Factor 4: Past Performance
Factor 5: (Optional): Site Visit and Product Demonstration
Factor 6: Price Proposal

(*See id.* at AR10028-29.)  The Solicitation established the following order of importance for each of the evaluation factors:

> Factors 1 and 2 are of equal importance and more important than factors 3, 4 and 5 (if factor 5 is utilized by the Government), which are in descending order of importance. All the technical factors when combined are significantly more important than price (Factor 6).

(*Id.* at AR10029.)

The Solicitation advised that the evaluation of each non-price Factor will be done "holistically" and DHS would use a rating scale of "High Confidence," "Some Confidence," and "Low Confidence," which represented the "Government's confidence that the Offeror understands the requirement and will be successful in performing the work."  (*Id.* at AR10027.)

For <u>Factor 1, Experience</u>, offerors were required to demonstrate that the software proposed has been implemented (currently or in the past) in an agency similar to DHS, with at least 6,500 users and the Government assess its confidence that the Offeror will be successful in performing the requirement based on the information submitted.  (*Id.* at AR10021).

For <u>Factor 2, Functional Capability</u>, offerors were to provide the name of their proposed integrated COTS software solution and demonstrate that the software proposed meets

or exceeds all functional requirements of Attachment J-3 EFiMS Integrated Requirements.  (*Id.* at AR10022.)  The Solicitation advised that:

> The Government will assess its confidence that the Offeror will be successful in performing the requirement based on its completed Attachment J-3 and business process narratives, which demonstrate that the software proposed meets or exceeds all functional requirements. More weight will be given to the offeror's ability to meet the most critical functionalities identified in J-3 during the evaluation.
>
> The Government will assess its confidence that the Offeror will be successful in supporting a large user load.
>
> The Government will assess its confidence on whether the software proposed is able to allow the government to move to a Software-as-a-Service (SaaS) offering and the degree to which it is capable of obtaining a DHS ATO within the applicable environment (cloud or DHS Data Center).

(*Id.* at AR10028.)

For <u>Factor 3, License Terms & Conditions and Security Overview</u>, the Solicitation advised that the "Government will assess its confidence that the Offeror will be successful in performing the requirement based on the degree to which the proposed services and software complete license terms and conditions are favorable to the Government and comply with Federal law."  (*Id.* at AR10029.)

For <u>Factor 4, Past Performance</u>, offerors were required to provide up to three relevant past performance references, at least one of which was to be for an experience utilized by the offeror in its Factor 1 – Experience submission.  (*Id.* at AR10024.)  Past performance efforts were required to be "either on-going or successfully completed within the last three years from the due date for proposals."  (*Id.*)  "Relevant" was defined as "work similar in size, scope and

complexity (at least 6,500 users) to the work identified in the solicitation." (*Id.*)  DHS would

"assess its confidence that the offeror will be successful in performing the requirement based

on the up to three (3) past performance references, to also consider whether the efforts are

similar in size and scope and whether they are on-going or were completed within the last three

years." (*Id.* at AR10029.)

For Factor 6: Price Proposal, the Solicitation stated that "the Government will evaluate

the commercial price and the discounted price" and the "Government will evaluate the Price

Scenario to determine a Total Evaluated Price, for price evaluation purposes only." (*Id.*)  The

Solicitation further advised that "The Offeror's price will be evaluated to determine price

reasonableness.  The offeror's proposed prices contained in all tabs in Attachment J-2 (Pricing

Structure) will be evaluated for price reasonableness." (*Id.*)

## III.    Amendments and Proposal Submissions

DHS amended the RFP twice before the receipt of initial proposals, which were

submitted on November 26, 2019.  (*See* Tabs 25-26 (Amendments 1 & 2), Tabs 48-51 (initial

proposals of awardees and Savantage).)  Proposals were submitted by Mythics, Savantage,

██████████████████ (████), Carahsoft, CGI Federal Inc. ("CGI"),████, and ████ (*See* Tab

63 at AR9796.)  On June 24 and 30, 2020, DHS issued Amendments 3 and 4, respectively, which

changed the Statement of Work, and pricing spreadsheet, among other things, and allowed

offerors to submit a revised proposal by July 9, 2020.  (*See* Tabs 27 & 28.)  Mythics and the

other offerors submitted revised proposals by July 9, 2020.  (*See* Tabs 52-55.)

On October 28, 2020, the Agency issued Amendment 5 to the RFP, which incorporated

the following FAR provisions and clause in the Solicitation:

████████████████████████████████████████████████████████

██████████████████████████████████████████████

- FAR 52.204-24, Representation Regarding Certain Telecommunications and Video Surveillance Services or Equipment (OCT 2020)

- FAR 52.204-25, Prohibition on Contracting for Certain Telecommunications and Video Surveillance Services or Equipment (DEVIATION 20-05) (AUG 2020)

- FAR 52.204-26, Covered Telecommunications Equipment or Services-Representation (OCT 2020)

(*See* Tab 57 at AR9693.)  Amendment 5 provided that "Offerors shall complete and return the representations contained in FAR provisions 52.204-24 and 52.204-26, which are provided in the attachment to this amendment, to the government by Monday November 2, 2020, @ 12:00 p.m. Eastern Time (ET)." (*Id.*)  Offerors were also allowed to revise their proposals only to the extent necessary to comply with the requirements of FAR 52.204-25, and were also asked to confirm that their proposal remains valid and will continue to remain valid through February 28, 2021. (*Id.*)  Although Mythics and Carahsoft submitted responses to Amendment 5 after the established deadline, the Contracting Officer nonetheless decided to keep their proposals in the competition, finding Amendment 5 to be non-material since it was "issued principally to address administrative updates to a FAR clause and two provisions, in addition to the proposal validity date confirmation," and accepting the completed representations would "not place the other offerors … at any discernable competitive disadvantage." (*See* Tab 59 at AR9741.)

Thereafter, DHS issued a competitive range determination which excluded Mythics, Savantage, and several other offerors from the competition.  (*See* Tab 65.)  Both Mythics and Savantage filed pre-award protests of their exclusion, which resulted in DHS taking corrective action.  (*See* Tabs 67a, 67b.)  On April 21, 2021, during corrective action, the Agency issued Amendment 6, rescinding the previously established competitive range, revising Section L,

Volume 2- Business proposal instructions, and allowing offerors to submit revised price proposals. (*See* Tab 68 at AR9921.) On May 3, 2021, through Amendment 8, the Agency announced that it intended to enter into discussions with all offerors that decide to continue participation in the procurement. (*See* Tab 70 at AR10066.) As a result, the Agency entered into multiple rounds of discussions with multiple offerors, including Savantage and Mythics, and after the second round of discussions, both offerors submitted Final Proposal Revisions on July 16, 2021. (*See* Tabs 84 (Mythics' Round 2 Final Proposal Revisions) and 86 (Savantage Round 2 Final Proposal Revisions).)

## IV.    Award Decision

On September 2, 2021, the Agency awarded contracts to Mythics, Carahsoft, and CGI, finding that they provide the "best value" to the Government for the EFiMS requirement. (*See* Tab 92 at AR12270; *see also* Tab 91.) The final evaluation ratings were as follows:



(*Id.* at AR12262.) This protest follows.

## STANDARD OF REVIEW

Pursuant to Rule 52.1(c) of the Rules of the United States Court of Federal Claims ("RCFC"), the court is to review an agency's procurement decision based on the administrative record. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356–57 (Fed. Cir. 2005). The inquiry is "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *A & D Fire Prot., Inc. v. United States*, 72 Fed. Cl. 126, 131 (2006). Thus, the resolution of the cross-motions presented here is akin to an expedited trial on the paper record, and the court must make fact findings where necessary. *Bannum*, 404 F.3d at 1356. Unlike a summary judgment proceeding, genuine issues of material fact will not foreclose judgment on the administrative record. *Id*.

The Tucker Act, as amended, provides that when a bid protest is brought under §1491(b), the Court of Federal Claims "shall review the agency's decision pursuant to the standards set for in section 706 of title 5." 28 U.S.C. § 1491(b)(4). Accordingly, "the inquiry is whether the agency's actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and if so whether the error is prejudicial. . . . The court's task is to determine whether (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'" *Office Design Grp. v. United States*, 951 F.3d 1366, 1372-73 (Fed. Cir. 2020) (quotation marks and citations omitted).

This review is "highly deferential" and "the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis." *Bahrain Mar. & Mercantile Int'l BSC (C) v. United States*, 118 Fed. Cl. 462, 477 (2014) (quotation marks and citation omitted); *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332–33 (Fed.

Cir. 2001) ("Contracting officers are 'entitled to exercise discretion upon a broad range of issues confronting them' in the procurement process." (quoting *Latecoere Int'l, Inc. v. U.S. Dep't of the Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994)); *see also Banknote Corp. of Am. v. United States*, 56 Fed. Cl. 377, 384 (2003), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004) (holding mere disagreements with agency evaluations "fall far short of meeting the heavy burden of demonstrating that the findings in question were the product of an irrational process and hence were arbitrary and capricious."); *see also Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971) ("The court is not empowered to substitute its judgment for that of the agency.").

Further, even if a protester shows an error in the procurement, it must also establish that the error "significantly prejudiced" it. *Bannum*, 404 F.3d at 1353; *see also Office Design Grp.*, 951 F.3d at 1371. To establish "significant prejudice," the protestor must show that "there was a substantial chance it would have received the contract award but for the errors" in the procurement. *Bannum*, 404 F.3d at 1353 (citations omitted); *see also Glenn Def. Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 912 (Fed. Cir. 2013).

Contrary to Savantage's contention, the Court may not "presume" prejudice when an agency is found to have acted in an arbitrary and capricious manner. For that proposition, Savantage cites *DynCorp Int'l LLC v. United States*, 148 Fed. Cl. 568, 584-85 (Fed. Cir. 2020), which cites other Court of Federal Claims decisions for the notion that "when an irrational or arbitrary and capricious agency action has occurred, prejudice is presumed." However, Savantage fails to note that the Federal Circuit Court of Appeals rejected the notion of "presumed prejudice" in the appeal of a subsequent decision in the *DynCorp International* case. The Federal Circuit stated: "The APA also requires that 'due account shall be taken of the rule of

prejudicial error.'  5 U.S.C. § 706.  So, '[t]o prevail in a bid protest,' a protestor must show a significant, prejudicial error in the procurement process.'"  *DynCorp Int'l, LLC v. United States*, 10 F.4th 1300, 1308 (Fed. Cir. 2021).  Importantly, the Federal Circuit added for clarity: "*The APA does not provide an exception to the prejudicial-error rule for arbitrary and capricious action.*"  *Id.* at 1308 n.6 (emphasis added).  Accordingly, no presumption of prejudice applies to arbitrary and capricious agency actions; the protester must "show" prejudice.

Plaintiff has not carried these burdens, and its protest must be denied.

## ARGUMENT

I.   **The Agency's Procurement Procedure was in Accordance with the FAR and the Solicitation and Savantage was not Prejudiced**

   A.   **Mythics' Nov. 2, 2020 Response to Amendment 5**

Savantage argues that Mythics' response to RFP Amendment 5 was late and that required DHS to remove Mythics from the competition under the "late-is-late" rule.  (Pl. MJAR at 16-22.) Savantage argues that Mythics' response to Amendment 5 was a late proposal modification because that amendment: (a) required representations related to a national security-related prohibition on procuring Chinese telecommunications equipment and services; and (b) sought confirmation of the continuing validity of proposals.  (*See id.* at 20.)

However, Savantage misleadingly omits large swaths of relevant factual background and legal context regarding the response to Amendment 5.  Contrary to Savantage's argument, the late-is-late rule does not apply to Mythics' submission, in response to Amendment 5.  Mythics did not revise or modify its proposal.  Instead, Mythics merely provided very limited supplemental information that pertains to its *responsibility under FAR subpart 9.1*, not the

evaluation of its proposal.  It was well within DHS's discretion to waive the deadline for that

information, and that waiver did not confer any competitive advantage on Mythics given that the

information was not relevant to the evaluation of proposals.  And even if the late-is-late rule did

apply, any improper consideration of the late submission was overtaken by subsequent events, as

DHS subsequently *excluded Mythics* from the competitive range for other reasons, then took

corrective action in response to protests, *reopened the competition to all offerors*, and received

proposal revisions that mooted the earlier proposals.  For these reasons, described in more detail

below, this protest ground must be denied.

### 1.    Background

As an initial matter, Savantage claims this issue is "simple," but only because Savantage

has overly simplified its argument by omitting much of the relevant factual background and legal

context.  It is important to bear in mind that Mythics timely submitted an initial proposal under

the RFP on November 26, 2019 in response to the original RFP, as modified in Amendments 1

and 2 (Tab 50), and that Mythics timely submitted a revised proposal on July 9, 2020 in response

to RFP Amendments 3 and 4.  (Tab 54.)  On October 28, 2020, when the July 2020 round of

proposal revisions was under review, DHS issued Amendment 5.  (Tab 57.)  Amendment 5 did

not request or allow offerors to submit full proposal revisions.  It requested a very limited

response, by 12:00 pm on November 2, 2020.  Amendment 5 requested that offerors submit

representations under new versions of two FAR provisions (FAR 52.204-24 and FAR 52.204-

26), incorporated the new version of the clause FAR 52.204-25 into the RFP, and requested that

offerors confirm their existing proposals remained valid and would remain valid through

February 28, 2021.  (*Id.* at AR9693.)  Amendment 5 permitted offerors to revise their proposals

"only to the extent necessary to comply with the requirements of FAR 52.204-25."  (*Id.*
(emphasis in original).)  Amendment 5 was very limited in scope.

It is also important to appreciate the history and purposes of those FAR clauses and
provisions that were the subject of Amendment 5, which show that the scope of Amendment 5
was even more limited than Savantage suggests.  FAR 52.204-24, -25, and -26 implement a ban
on certain Chinese telecommunications equipment and services that was enacted by Congress in
Section 889 of the National Defense Authorization Act ("NDAA") for Fiscal Year 2019.  Pub. L.
115–232, 132 Stat. 1917 (Aug. 13, 2018).  Section 889 primarily did two things.  First, its section
(a)(1)(A) it prohibited agencies from "*procur[ing] or obtain[ing]*, or extend[ing] or renew[ing] a
contract to procure or obtain, any equipment, system, or service that uses covered
telecommunication equipment or services as a substantial or essential component of any system,
or as a critical technology as part of any system."  *Id.* (emphasis added).  Second, its section
(a)(1)(B) prohibited agencies from "*enter[ing] into a contract* (or extend[ing] or renew[ing] a
contract) *with an entity that uses* any equipment, system, or service that uses covered
telecommunications equipment or services as a substantial or essential component of any system,
or as critical technology as part of any system."  *Id.* (emphasis added); *see also* 85 Fed. Reg.
42665 (July 14, 2020) (interim rule implementing regulations, noting that Sec. 889(a)(1)(A) and
(a)(1)(B) are the "two key sections" of Section 889)).[2]

Section 889 contemplated a staggered roll-out of these two prohibitions.  The Sec.
889(a)(1)(A) ban on *procuring or obtaining* covered equipment or services was to take effect one

---

[2] "Covered telecommunications equipment or services" was defined in paragraph (f) of Section
889 to mean equipment and services produced by certain Chinese companies.  *Id.*

year after the NDAA's enactment date of August 13, 2018; the Sec. 889(a)(1)(B) ban on *entering into contracts* with entities that *use* covered equipment or services was to take effect two years after enactment. *Id.* at Sec. 889(c).

Accordingly, the Sec. 889(a)(1)(A) prohibition on *procuring or obtaining* was implemented through an interim rule in the Federal Register on August 13, 2019, one year after the enactment of the NDAA for FY 2019. *See* 84 Fed. Reg. 40216 (Aug. 13, 2019). That interim rule created FAR 52.204-24 and FAR 52.204-25 to implement Sec. 889(a)(1)(A). FAR 52.204-25 (Aug 2019) was established as a contract clause that, in its paragraph (b), notes Sec. 889(a)(1)(A)'s prohibition on agencies procuring or obtaining covered equipment or services, and expressly prohibits the contractor "from providing to the Government any equipment, system, or service that uses covered telecommunications equipment or services as a substantial or essential component of any system, or as critical technology as part of any system, unless an exception" or waiver applies. 84 Fed. Reg. at 40222. In its paragraph (f), the FAR 52.204-25 (Aug 2019) imposed reporting requirements on the contractor "[i]n the event the Contractor identifies covered telecommunications equipment or services used as a substantial or essential component of any system, or as critical technology as part of any system, during contract performance, or the Contractor is notified of such by a subcontractor at any tier or by any other source." *Id.* at 40222-23. FAR 52.204-24 (Aug 2019), in turn, was established as a solicitation provision that directed the offeror to check a box to represent whether it will or will not "provide covered telecommunications equipment or services to the Government in the performance of any

contract, subcontract or other contractual instrument resulting from this solicitation."  *Id.* at

40222 (hereinafter, the "Performance Representation").[3]

   Savantage argues that Amendment 5's requirement for the Performance Representation is

what made offerors' responses to that amendment important.  (*See* Pl. MJAR at 19 n.6

(describing the "gravitas" of FAR 52.204-24 and -25 as being that they "require offerors to

represent whether they would *provide* specified equipment or services" from entities deemed to

be national security threats) (emphasis added); *id.* at 20 (criticizing DHS for finding the

representations dealing with "*procurement* of telecommunications and video surveillance

services or equipment" to be non-material) (emphasis added).)[4]

   Savantage's argument misses the mark, because Amendment 5 *did not introduce* the

Performance Representation and accompanying performance requirement not to provide covered

equipment and services.  The RFP already incorporated them prior to Amendment 5.  The

August 2019 versions of FAR 52.204-24 and FAR 52.204-25 were incorporated into the initial

RFP in this procurement, issued October 30, 2019 (*see* Tab 24b at AR5432, AR5451-52), and

they remained in the RFP through Amendment 4, dated June 30, 2020.  (*See* Tab 27c at AR6312,

---

[3] On December 13, 2019, the FAR Council published an interim rule that created FAR 52.204-26, which allows prospective contractors to make the Performance Representation in its annual representations in the System for Award Management ("SAM") and thereby to skip the offer-by-offer Performance Representation in FAR 52.204-24.  *See* 84 Fed. Reg. 68314 (Dec. 13, 2019). The Performance Representation in FAR 52.204-24(c) (Aug 2019) is substantively identical to that in FAR 52.204-26(c) (Dec 2019); the only difference being that the -26 clause representation allows firms to represent that they do not provide covered equipment or services to the Government on *any* contract, subcontract, or other contractual instrument, whereas the -24 representation is specific to the solicitation in which it is present.

[4] Savantage does not rely on (or mention) the second representation in FAR 52.204-24 and -26 regarding the "use" of covered equipment and services, discussed below.

AR6331-32 (Amendment 3, dated June 24, 2020)[5].)  *Accordingly, Mythics' July 9, 2020*

*proposal likewise incorporated the August 2019 version of FAR 52.204-25 and* <u>*included*</u> *a*

*Performance Representation under FAR 52.204-24 that it "will not" provide covered equipment*

*and services*.  (*See* Tab 54a at AR9246-47 (Mythics' Performance Representation in July 9, 2020

proposal).)  And while the RFP prior to Amendment 5 did not incorporate FAR 52.204-26, that

provision's Performance Representation is substantively redundant with the Performance

Representation in FAR 52.204-24, which was already incorporated.  Savantage's assertion that

Mythics had to respond to Amendment 5 to make the *Performance* Representation is thus false.

The novelty of Amendment 5 was not the Performance Representation, but rather

Amendment 5's incorporation of the *second* part of Section 889—the Sec. 889(a)(1)(B)

prohibition on entering into contracts with entities that use covered equipment and services.

Following the submission of the July 2020 round of proposals, that second prohibition came into

effect when two years passed since the August 13, 2018 enactment of Sec. 889.  The Sec.

889(a)(1)(B) prohibition was implemented through revisions to FAR 52.204-24, -25, and -26.

New versions of FAR 52.204-24 and -25 that incorporated Sec. 889(a)(1)(B) were established in

an interim rule that took effect August 13, 2020.  *See* 85 Fed. Reg. 42665 (July 14, 2020).  The

revision to FAR 52.204-24 added a new representation in paragraph (d)(2) about whether the

offeror is eligible to receive award under Sec. 889(a)(1)(B)'s prohibition on entering into a

contract with an entity that "use[s] covered telecommunications equipment or services, or use

any equipment, system, or service that uses covered telecommunications equipment or services"

---

[5] Amendment 4, which did not include a full copy of the RFP, did nothing to remove FAR
52.204-24 or -25 from the RFP as it existed at the time.  (*See generally* Tab 28.)

(hereinafter, the "Use Representation").  *Id.* at 42678.[6]  The revision to FAR 52.204-24 did not

substantively change the pre-existing Performance Representation of Sec. 889(a)(1)(A), which

became paragraph (d)(1) of FAR 52.204-24.  The revision to FAR 52.204-25 similarly added a

paragraph (b)(2) that references the Sec. 889(a)(1)(B) prohibition on agencies entering into

contracts with entities that *use* covered equipment and services, but it *does not add or change

any performance requirements*.  *See id.* at 42679.  The already-existing prohibition on providing

covered equipment or services in performance that had been in paragraph (b) became paragraph

(b)(1) and was substantively unchanged; also substantively unchanged were the reporting

obligations in paragraph (f).  *See id.*

These revisions to FAR 52.204-24, -25, and -26 spurred DHS to issue Amendment 5 on

October 28, 2020.  Amendment 5 incorporates the revised versions of those provisions and

clauses into the RFP.  (*See* Tab 57 at AR9693.)  Accordingly, Amendment 5 did not put in place

the prohibitions on Chinese telecommunications equipment and services for the first time, as

Savantage suggests.  Rather, as discussed above, the RFP already included the Sec. 889(a)(1)(A)

prohibition on *providing* covered equipment and services in performance of the contract and the

Performance Representation, and Mythics had already represented in its existing July 9, 2020

proposal that it will not provide covered equipment and services under the contract.  Amendment

5 merely stated that the Government cannot *enter into a contract* with an entity that uses covered

---

[6] Effective October 26, 2020, another interim rule revised FAR 52.204-26 to incorporate the Use
Representation into that provision.  This allows companies to make the Use Representation in
their annual representations in SAM rather than make the Use Representation in FAR 52.204-24
in every proposal.  *See* 85 Fed. Reg. 53126 (Aug. 27, 2020).  The Use Representation in FAR
52.204-26(c)(2) is substantively identical to that in FAR 52.204-24(d)(2).

equipment and services, and requested a representation that the offeror does not (i.e., the Use Representation).

While Amendment 5 also permitted offerors to revise their proposals as necessary to comply with the new FAR 52.204-25 (*see* Tab 57 at AR9693), Mythics did not seek to revise its proposal. (*See* Tab 59 at AR9741 (DHS's memorandum, noting that "[n]either Carahsoft nor Mythics submitted a revised proposal as a result of Amendment 5").) Mythics did not revise its price, technical proposal, past performance, or any other part of its evaluated proposal in response to Amendment 5. (*See* Tab 59 at AR9741; *see also* Tab 101 at AR13324-33 (Mythics' Nov. 2, 2020 submission).)

Mythics submitted its response to Amendment 5 at 12:32 pm on November 2, 2020, 32 minutes after the 12:00 pm time established in Amendment 5 for responses. (*See* Tab 59 at AR 9740-41; Tab 101 at AR13324.) DHS recognized and considered that Mythics had not strictly complied with the instruction to respond by 12:00 pm on November 2, 2020 in a "Memo to the File." (*See id.*) DHS concluded that the noncompliance was not material because the submission was administrative in nature rather than a substantive change to Mythics' proposal and accepting "late" submission of the representations would not disadvantage competitors. (*See id.* at AR9741.) DHS also noted that Mythics' existing proposal, submitted July 9, 2020, "does not contain an identifiable expiration date." (*Id.* at AR9740.)

Savantage also misleadingly omits a great deal that occurred in this procurement after the November 2, 2020 submission. In Savantage's oversimplified telling, DHS simply made the award to Mythics after its November 2, 2020 submission. In fact, the next thing that happened, in March 2021, is that DHS *excluded Mythics from the competition*—the very result Savantage

requests—as a result of the evaluation.  (Tab 65 at AR9880, AR9884.)  Then Mythics protested

its exclusion from the competitive range, as did Savantage, and DHS decided to take corrective

action in response to the protests and re-open the competition.  (*See* Tab 67a at AR9915-16; Tab

67b at AR9918-19.)  DHS subsequently opted to conduct discussions with *all offerors* that

wished to remain in the procurement.  (*See* Tab 70 at AR10066 (Amendment 8 to the RFP,

stating "[t]he government will enter into Discussions with all offerors that decide to continue

participation in the EFiMS procurement"); *see also* Tab 92 at AR12261 ("[I]t was ultimately

determined to be in the best interest of DHS to conduct Discussions with all offerors who

submitted proposals under the EFiMS solicitation.").)[7]  Mythics thereby entered discussions.

(*See* Tabs 71c, 76, 77, 80c, 83, 84.)  In each of the two rounds of discussions, DHS sought final

proposal revisions, and Mythics submitted proposal revisions.  (*See* Tabs 71c, 77, 80c, 84.)  DHS

ultimately made award to CGI, Carahsoft, and Mythics on the basis of their July 2021 final

proposal revisions.  (*See, e.g.*, Tab 92 at AR12261-62 (Award Decision Mem., describing

offerors' ratings and prices based on evaluation of FPRs following two rounds of discussions).)

>        **2.**        **The Late-is-Late Rule Does Not Apply**

>              **a)**        **The Chinese Telecommunications Ban**

The foregoing background illuminates why the late-is-late rule did not require Mythics'

elimination from the competition for submitting its response to Amendment 5 at 12:32 pm on

_____

[7] In addition to Mythics, offerors Savantage, ███████████████████████ had been
excluded from the competition in the competitive range determination.  (*See* Tab 65 at 16.)
When DHS reopened the procurement in taking corrective action, only ████ did not take the
invitation to re-enter the competition.  (*See* Tab 92 at AR12261.)  DHS entered into discussions
with, and received revised proposals from, all of the other offerors.  (*See* Tab 89 at AR12047.)

November 2, 2020.  The submission of that response by a particular date and time was immaterial, because the information provided therein has no impact on the price, quantity, quality, or delivery of Mythics' proposal and relates to Mythics' responsibility, rather than its technical evaluation.  Accordingly, DHS was within its discretion to waive Mythics' noncompliance with the instruction to submit the information by a particular date and time, and DHS properly could accept the information at any time.

While Savantage focuses on the late-is-late rule, FAR 52.212-1 also contains a different rule that *allows* agencies to accept certain submissions of information by offerors after the established time.  Paragraph (g) of FAR 52.212-1 provides that "[t]he Government may … *waive informalities and minor irregularities in offers received*."  (Emphasis added.)  FAR 14.405, while not strictly applicable to negotiated procurements, addresses what constitutes waivable "informalities and minor irregularities."  The Federal Circuit Court of Appeals and Court of Federal Claims have looked to FAR 14.405 for guidance on that question even in negotiated procurements.  *See Safeguard Base Operations, LLC v. United States*, 989 F.3d 1326, 1347 (Fed. Cir. 2021); *see also Electronic On-Ramp, Inc. v. United States*, 104 Fed. Cl. 151, 166-67 (2012). FAR 14.405 provides:

> A minor informality or irregularity is one that is merely a matter of form and not of substance.  It also pertains to some immaterial defect in a bid or variation of a bid from the exact requirements of the invitation that can be corrected or waived without being prejudicial to other bidders.  The defect or variation is immaterial when the effect on price, quantity, quality, or delivery is negligible when contrasted with the total cost or scope of the supplies or services being acquired.  …

FAR 14.405 also provides examples of waivable informalities and irregularities, including, among others, the offeror's failure to:

> (d) Acknowledge receipt of an amendment to an invitation for bids, but only if-
>
> > (1) The bid received clearly indicates that the bidder received the amendment, such as where the amendment added another item to the invitation and the bidder submitted a bid on the item; or
> >
> > (2) The amendment involves only a matter of form or has either no effect or merely a negligible effect on price, quantity, quality, or delivery of the item bid upon; and
>
> (e) Execute the representations with respect to Equal Opportunity and Affirmative Action Programs, as set forth in the clauses at 52.222-22, Previous Contracts and Compliance Reports, and 52.222-25, Affirmative Action Compliance.

Here, it was within DHS's discretion to waive Mythics' submission of its response to Amendment 5 after the time set for receipt because the submission was not a substantive revision of the proposal and had no impact on price, quantity, quality, or delivery. As discussed above, Amendment 5 did not modify any performance obligations. While Amendment 5 allowed offerors to revise their proposals as necessary to comply with the new version of FAR 52.204-25, Mythics did not need to do so and did not attempt to do so. Accordingly, Amendment 5 neither required nor resulted in any substantive change to Mythics' proposal. Rather, Amendment 5's addition of the revised FAR 52.204-25 merely highlighted the fact that *DHS is now prohibited from entering into a contract* with certain entities. And Amendment 5's inclusion of the revised FAR 52.204-24 and -26 required offerors to provide a representation that they are not such ineligible entities (i.e., a Use Representation). There is no competitive advantage to be gained in the procurement by making a late representation of eligibility. Indeed, nothing in the RFP's

evaluation criteria indicated that this representation would be part of the comparative evaluation of proposals for determining the best value.  (*See* Tab 27c at AR6369-72 (the most recent version of Section M as of the Nov. 2, 2020 submission, in Amendment 3).)  Notably, as the quotation above shows, FAR 14.405 expressly identifies an analogous issue—an offeror's failure to make representations required by other FAR provisions—as an example of an informality or minor irregularity that may be waived.  *See* FAR 14.405(e).[8]

Indeed, the only representation that was added in Amendment 5—the Use Representation—pertains to Mythics' *responsibility*, rather than its technical evaluation, and, as such, may be considered if submitted at any time up to the time of award.  "[R]esponsibility and technical acceptability are distinct matters."  *Chags Health Info. Tech., LLC*, B-413104.30, 2019 WL 1858368, at *5 (Comp. Gen. April 11, 2019).  Wholly apart from determining the best value under the solicitation's evaluation criteria, a contracting agency must also determine that the prospective awardee is *responsible* in order to enter into a contract.  The FAR requires contracts to be awarded only to "responsible prospective contractors," and provides that "[n]o purchase or

---

[8] Savantage also notes that Mythics' November 2, 2020 submission did not include a signed Standard Form 30, but does not appear to make any argument with respect to that fact.  (*See* Pl. MJAR at 19-20.)  In any event, an omission of a formal acknowledgement of Amendment 5 by signing the SF30 is also a waivable informality or minor irregularity.  The omission of a formal acknowledgement is expressly waivable under FAR 14.405(d)(1), quoted above, because Mythics included the representations and the text of FAR 52.204-25 in its response, and thereby made clear that it received the amendment.  (*See* Tab 59 at AR9740; Tab 101 at AR13324-33.)  Furthermore, it was waivable under FAR 14.405(d)(2) because Amendment 5 did not have any material effect on price, quantity, quality, or delivery, because, as discussed above, it merely added the Use Representation to confirm that the offeror is eligible for award.  Because providing a formal acknowledgment *at all* is a waivable informality or minor irregularity, the timing of acknowledgment is also a waivable informality or minor irregularity.  Additionally, for the same reasons, DHS was within its discretion to waive Carahsoft's late submission of a signed SF30.

award shall be made unless the contracting officer makes an affirmative determination of responsibility." FAR 9.103(a), (b). FAR 9.104-1 discusses the general scope of a responsibility determination. It provides that, to be responsible, an offeror must, among other things: have or be able to obtain adequate resources to perform; have a satisfactory record of integrity and business ethics; and have or be able to obtain the necessary organization, experience, accounting and operational controls, and technical skills. FAR 9.104-1. Most relevant here, to be responsible, an offeror must "[b]e otherwise qualified and eligible to receive an award under applicable laws and regulations." FAR 9.104-1(g). Here, the Use Representation concerns the offeror's eligibility to receive an award under a statute (Sec. 889 of the NDAA for FY 2019) and implementing regulations that prohibit agencies from entering into contracts with certain entities—namely, entities that use the covered equipment or services. The Use Representation is responsibility information.

Indeed, the Use Representation clearly falls within the scope of the standard of responsibility set forth at FAR 9.104-1(g), which states that "to be determined responsible, a prospective contractor must - . . . (g) be otherwise qualified and eligible to receive an award *under applicable laws and regulations*." FAR 9.104-1(g) identifies the "inverted domestic corporation prohibition at 9.108" as an example of a responsibility issue.[9] The Use Representation of FAR 52.204-24 and -26 is no different—it too implements a law that prohibits

---

[9] FAR 9.108-2 explains that Section 745 of Division D of the Consolidated Appropriations Act, 2008 (Pub. L. 110-161) and its successor provisions prohibit agencies from entering into contracts with inverted domestic corporations. FAR 9.108-5 requires inclusion in every solicitation of a representation, set out in FAR 52.209-2, that the offeror is not an inverted domestic corporation. As noted, the inverted domestic corporation representation is expressly identified in FAR 9.104-1(g) as responsibility information.

agencies from entering into contracts with certain entities by requiring offerors to represent that they are not such entities.  *See* Pub. L. 115-232, § 889(a)(1)(B) (prohibiting agencies from "enter[ing] into a contract (or extend[ing] or renew[ing] a contract) with an entity that uses any equipment, system, or service that uses covered telecommunications equipment or services as a substantial or essential component of any system, or as critical technology as part of any system"); *see also* 85 Fed. Reg. at 42666 (interim rule amending FAR 52.204-24 to add the Use Representation, stating "[t]his rule implements 889(a)(1)(B) and requires submission of a representation with each offer that will require all offerors to represent, after conducting a reasonable inquiry, whether covered telecommunications equipment or services are used by the offeror").  The Use Representation, therefore, is information that pertains to the offeror's *responsibility*.

Notably, GAO has repeatedly stated that a firm's failure to complete required standard representations and certifications that do not reduce or modify the contractor's obligation to perform the solicitation's requirements goes to the *responsibility* of the firm rather than the acceptability of its proposal.  *See Veterans Constr. of S.C., LLC*, B-401723.2, 2010 WL 236827, at *2 (Comp. Gen. Jan. 21, 2010) ("With respect to certificates and representations, we examine the certificate or representation to determine whether it concerns the bidder's responsiveness (that is, its commitment to provide the required services) or its responsibility.  Generally, we have found that the failure of a bidder to include completed standard representations and certifications with its bid does not render the bid nonresponsive because it does not affect the bidder's material obligations."); *McCann-Erickson USA, Inc.*, B-414787, 2017 WL 4385965, at *5 (Comp. Gen. Sept. 18, 2017) ("[T]o the extent that a firm's proposal (or its SAM database

entry) did not include all of the required representations and certifications, such a lack of information relates to the responsibility of the firm rather than to the acceptability of its proposal."); *JRS Staffing Servs.*, B-409360, 2014 WL 1266138, at *5 (Comp. Gen. March 27, 2014) ("[T]he completion of representations and certifications is ordinarily a matter of responsibility, and does not factor into a best value determination."); *see also Charter Environmental, Inc.*, B-297219, 2005 WL 3288200, at *3 (Comp. Gen. Dec. 5, 2005) ("The failure to include with a bid completed standard representations and certifications does not render the bid nonresponsive because it does not affect the bidder's material obligations.  Such a failure therefore may be waived as a minor bidding irregularity and the information may be furnished after bid opening.").  Similarly, here, the Use Representation does not modify the contractor's performance obligations; it merely confirms that the offeror is eligible to receive the contract.  It therefore pertains to the offeror's responsibility.

The import of the Use Representation being responsibility information is that "[r]esponsibility may be satisfied *at any time prior to award*, as opposed to technical acceptability, which must be satisfied based on a common proposal deadline." *Chags Health Info. Tech.*, 2019 WL 1858368, *supra* at *5 (emphasis added).  GAO has thus "explained that agencies may reasonably find offerors or bidders responsible based on information pertaining to responsibility, even where that information is submitted after the time for receipt of proposals or bids"—and "even where a solicitation states that documents related to responsibility must be submitted by a deadline, an agency is not required to reject a proposal or bid as unacceptable or nonresponsive based on a failure to satisfy a responsibility criterion by the deadline." *Id.* at *6

(sustaining protest where agency refused to consider information pertaining to responsibility that protester submitted after the proposal due date).

The Court of Federal Claims, too, has recognized the omission of responsibility information from a proposal does not render the proposal ineligible, because responsibility determinations may be based on information gathered up to the time of award.  *See, e.g.*, *DynCorp Int'l LLC v. United States*, 76 Fed. Cl. 528, 547 (2007) (holding that awardee's proposal omission of solicitation-required documentation relating to responsibility issue did not require rejection because an offeror may present evidence to demonstrate its responsibility subsequent to proposal submission); *see also Lawson Envt'l Servs., LLC v. United States*, 126 Fed. Cl. 233, 247 (2016) (stating that "because responsibility determinations are made at the time of award, an offeror may present evidence subsequent to proposal submission but prior to award to demonstrate the bidder's responsibility").  This is why "[a]gencies may … request and receive information about an offeror's responsibility without conducting discussions that trigger the obligation to conduct non-responsibility discussions with other offerors."  *Chags Health Info. Tech.*, 2019 WL 1858368, *supra* at *6, *citing Coast Int'l Sec., Inc*., B-411756, 2015 WL 7348949, at *9 (Comp. Gen. Oct. 19, 2015); *see also DynCorp Int'l LLC*, 76 Fed. Cl. at 546-47 (same); *WaveLink, Inc. v. United States*, 154 Fed. Cl. 245, 270-71 (2021) (same).  Mythics thus could submit, and DHS could receive and consider, information pertaining to Mythics' responsibility after the time set for receipt of proposals (or responses to Amendment 5), and that information does not constitute a proposal revision or modification.

The nature of the submission here thus distinguishes this case from *Geo-Seis Helicopters*, the case Savantage primarily relies on.  There, the late submissions were revised proposals

submitted after discussions. *See Geo-Seis Helicopters, Inc. v United States*, 77 Fed. Cl. 633, 636-37, 641 (2007). The late-is-late rule applies only to submissions of an "offer, modification, revision, or withdrawal of an offer"—and so clearly applied to the revised proposal in *Geo-Seis*. *See* FAR 52.212-1(f)(2)(i). Here, because the Use Representation is not a proposal revision or modification, but rather *responsibility information* that may be submitted after the time set for proposals, the Agency did not act arbitrarily or capriciously when it declined to apply the late-is-late rule to it. The Use Representation is responsibility information that is not material to price, quantity, quality, or delivery under the contract, and is not part of the comparative evaluation of proposals. DHS thus acted within its discretion to conclude that Mythics' temporary omission of the Use Representation—for 32 minutes between 12:00 pm and 12:32 pm on November 2, 2020—was immaterial and could be waived. (*See* Tab 59 at AR9741.)[10]

### b) Proposal Validity Extension

Savantage's argument that Amendment 5's request to confirm continuing proposal validity rendered Mythics' response a late proposal modification fairs no better. The Contracting Officer explained in his memorandum addressing the "late" Amendment 5 submissions that Mythics' existing July 9, 2020 proposal does not contain an identifiable expiration date. (*See* Tab 59 at AR 9740.) Accordingly, an extension of the proposal or confirmation of continuing validity was not necessary. Savantage makes no attempt to show that DHS's interpretation that Mythics' proposal remained valid was arbitrary and capricious.

---

[10] For the same reasons, DHS acted within its discretion to conclude that Carahsoft's temporary omission of its representations for less than 24 hours was immaterial and could be waived. (*See id.* at AR9740-41.)

Regardless, even if confirmation of the validity period was required, this would not trigger the late-is-late rule because the expiration of a proposal is an issue that can be resolved at any time up to and including the time of award.  It is well-established that an agency may generally allow an offeror to waive its proposal's expiration at any time, including by accepting an award on the basis of the expired proposal.  *See, e.g.*, *National Air Cargo Group, Inc. v. United States*, 127 Fed. Cl. 707, 719 n.11 (2016) ("When the time for accepting an offer expires, an offeror may revive the offer either expressly or impliedly through conduct but only if such revival does not compromise the integrity of the competitive process or prejudice other offerors.") (internal quotation marks omitted); *WIT Assocs., Inc. v. United States*, 122 Fed. Cl. 1, 14-15 (2015) ("One context in which such a waiver may be found to have occurred is when following expiration of the acceptance period, the bidder is still willing to accept an award on the basis of the bid as originally submitted.") (internal quotation marks omitted), *aff'd*, 668 Fed. Appx. 365, 2016 WL 4363179 (Fed. Cir. Aug. 16, 2016).  It was thus within DHS's discretion to evaluate Mythics' proposal even absent a confirmation of continuing proposal validity, because it remained possible that Mythics could waive its proposal expiration at a later date (assuming, only for the sake of argument, that its proposal expired).[11]

---

[11] For the same reason, it was within DHS's discretion to evaluate Carahsoft's proposal and accept Carahsoft's confirmation of its proposal's validity on November 3, 2020.  (*See* Tab 59 at AR9740-41.)

**3.**     **Even if the Late-Is-Late Rule Applied, Savantage was Not Prejudiced Because the Late Submission was Rendered Moot by Subsequent Corrective Action, Discussions, and Proposal Revisions**

Even assuming for the sake of argument that DHS was not permitted to consider Mythics' November 2, 2020 submission in evaluating its July 9, 2020 proposal, the 32-minute tardiness of the November 2, 2020 submission was ultimately irrelevant. Mythics was eliminated anyways, for other reasons. Then, following protests, the agency took corrective action and reopened the procurement with all offerors permitted to submit proposal revisions. The July 9, 2020 proposal was not the basis for the award to Mythics, and any flaws in that proposal are irrelevant to DHS's ultimate award decision, made on the basis of a later proposal revision.

Contrary to Savantage's assumption that Mythics would simply be removed from the competition but for the alleged violation of the late-is-late rule (Pl. MJAR at 22), the late-is-late rule does not require automatic elimination of the competitor that made a late submission. Rather, it merely prohibits consideration of the late submission in the evaluation of proposals. *See Geo-Seis Helicopters*, 77 Fed. Cl. at 645 n.26 ("In this instance, it is not evident that the late receipt of Presidential's [the late-submitting awardee] second revised proposal would have had the effect of eliminating Presidential from the competition. Late receipt of the second revision might have meant that Presidential would be barred from receiving the award based on that revision, but not that Presidential's prior proposals were also eliminated from consideration"); *id.* at 650 (ordering reevaluation to be limited to Presidential's earlier-filed proposal).

Here, as noted, Mythics had already submitted a proposal in this procurement; the July 9, 2020 proposal was the operative version at the time of Amendment 5. Accordingly, even

assuming for the sake of argument that the November 2, 2020 submission could not be considered in the evaluation of then-current proposals because of the late-is-late rule, Mythics still had a proposal in play and thus remained part of the competition.

To be sure, Mythics' July 9, 2020 proposal did not include a Use Representation, which was not required as of the time of that proposal version.  However, even if the absence of a Use Representation could be considered a proposal deficiency, it is well-established that, in negotiated procurements such as this, an agency may permit an offeror to cure deficiencies in its proposal through discussions and proposal revisions.  As the Court of Federal Claims has noted, "unlike a non-responsive bid in sealed bidding ... , a technically unacceptable proposal [in a negotiated procurement] may be considered for award if the proposal would otherwise be competitive and if its technically unacceptable terms can be cured by the offeror in a revised proposal."  *Guardian Moving & Storage Co. v. United States*, 122 Fed. Cl. 117, 133-34 (2015) (holding agency reasonably accepted revised proposal that cured missing elements of prior proposal), *quoting Carahsoft Tech. Corp. v. United States*, 86 Fed. Cl. 325, 341-42 (2009).  It therefore was within DHS's discretion to evaluate the merits of Mythics' July 9, 2020 proposal.

When DHS evaluated Mythics' proposal after Amendment 5, the result was, in fact, what Savantage now advocates for—DHS excluded Mythics from the competition as a result of perceived deficiencies in its proposal.  (Tab 65 at AR9880.)  This and subsequent events in the procurement mooted the "late" submission on November 2, 2020, and demonstrate that nothing would have changed even if DHS had rejected Mythics' November 2, 2020 submission under the late-is-late rule.

As noted above, following their exclusions from the competition, Mythics and Savantage protested.  In response to those protests, DHS elected to take corrective action of conducting discussions with, and soliciting revised proposals from, *all offerors* that wished to remain in the procurement.  (*See* Tab 70 at AR10066; Tab 89 at AR12047.[12])

Mythics subsequently submitted two further proposal revisions, on May 20, 2021 and July 16, 2021, following two rounds of discussions.  (*See* Tabs 71c, 77, 80c, 84.)  Those new proposal revisions mooted any flaws in Mythics' July 2020 proposal, including any deemed omission of a response to Amendment 5.  With respect to proposal expiration, even if Mythics' July 9, 2020 proposal had expired, that expiration became irrelevant when subsequent proposal revisions replaced it.  With respect to the representations, the reopening of the procurement and solicitation of revised proposals by May 20, 2021 and July 16, 2021 allowed DHS to consider Mythics' November 2, 2020 response to Amendment 5, even if the late-is-late rule had barred consideration in the earlier evaluation of the July 9, 2020 proposal.  That response was, of course, submitted long before the May 20, 2021 and July 16, 2021 deadlines for final proposal revisions and thus was timely relative to those proposal deadlines.  DHS could therefore consider Mythics' Performance Representation and Use Representation in its November 2, 2020 submission in determining the acceptability of Mythics' later proposal revisions.[13]  At a

---

[12] Having previously been excluded from the competition, Savantage and ███████████████ were permitted to re-enter the competition despite their proposed software having been evaluated as failing to meet minimum technical requirements, among other reasons.  (*See* Tab 65 at AR9877, AR9881.)  ████████ was allowed to re-enter the competition despite having failed to submit the correct pricing table in its earlier proposal, among other reasons.  (*See* Tab 65 at AR9884.)

[13] Also, while Savantage does not argue that Mythics' omission of a signed SF30 with its response to Amendment 5 rendered its proposal unawardable, Mythics resolved any such issue

minimum, DHS could consider the representations under an exception to the late-is-late rule for "a late modification of an otherwise successful offer, that makes its terms more favorable to the Government," because Mythics was selected as an awardee.  *See* FAR 52.212-1(f)(2)(ii).

Accordingly, DHS's reopening of the procurement and Mythics' subsequent proposal revisions resolved any issues with Mythics' prior, July 9, 2020 proposal that may have been caused by any deemed omission of a response to Amendment 5.  DHS's consideration of the November 2, 2020 submission in the evaluation of Mythics' July 9, 2020 proposal was irrelevant to its later award to Mythics in the reopened procurement.[14]  Accordingly, Savantage cannot show that it was prejudiced by any improper consideration of the November 2, 2020 submission in the evaluation of Mythics' July 9, 2020 proposal.  Because competitive prejudice is a required element of any protest, Savantage's late-is-late rule argument must be denied.  *See DynCorp Int'l*, 10 F.4th at 1308; *Glenn Def. Marine (ASIA), PTE Ltd.*, 720 F.3d at 912.

### B.  Price Reasonableness

Savantage next challenges DHS's evaluation of price reasonableness.  Savantage argues that DHS erred by: (a) failing to consider overall price and instead focused only on individual line-item prices; and (b) failing to consider whether price lists submitted by offerors were "competitive" and "published."  Neither argument has merit.

---

by submitting a signed version of the Amendment 5 SF30 in its May 20, 2021 and July 16, 2021 proposal revisions.  (See Tab 77a at AR10664, Tab 84a at AR11513.)

[14] For the same reasons, Savantage was not prejudiced by DHS's consideration of Carahsoft's submission of its response to Amendment 5 on November 3, 2020.

      1.      **Evaluation of Overall Price**

First, Savantage argues that the RFP and the FAR required a price reasonableness evaluation of both Total Evaluated Price and unit prices individually, and that DHS limited its evaluation to unit prices.  (Pl. MJAR at 22-25, 30-34.)  But the record shows that DHS, in fact, did consider offerors' Total Evaluated Prices in conducting its price reasonableness evaluation.  At the beginning of its "Price Analysis Summary" in the Business and Price Evaluation Report, the Business Evaluation Team ("BET") compared each offeror's Total Evaluated Price (i.e., "Scenario FPR Totals") to each other's in a table.  (Tab 88 at AR12007.)  The BET also prepared a table that compared each offeror's Total Evaluated Price (i.e., "Final 2 - Scenario Price") to its undiscounted Commercial List Price, and again compared each offeror's Total Evaluated Price to each other's Total Evaluated Price.  (*See* Tab 88 at AR12034 (top table).)  The BET prepared also compared each offeror's Total Evaluated Price (i.e., "Final 2 scenario Price") to the Independent Government Cost Estimate ("IGCE").  (*See id.* (table under paragraph "E")").)  At the conclusion of its report, the BET, again, placed all offerors' Total Evaluated Prices (i.e., "Final 2 Scenario Price") side-by-side in a table comparing them with one another and with the undiscounted "Commercial List Price" for each offeror.  (*Id.* at AR12043.)  The BET specifically observed and considered "the difference in the proposed costs in the Scenario Pricing" between the offerors.  (*Id.* at AR12040.)  The BET noted those differences were based in part on different license types between offerors, for example.  (*Id.*)

Lest there be any doubt, the record demonstrates that this consideration of Total Evaluated Prices, which were based on the notional pricing scenario, was part of the price reasonableness evaluation.  Regarding offeror ▮▮▮, the BET stated that it "was unable to

evaluate ███████ pricing *for price reasonableness*" because ██████ "did not provide the quantity identified in the pricing scenario."  (Tab 88 at AR12019 (emphasis added).)  That is, ██████'s Total Evaluated Price was not comparable to other offerors due to ██████s failure to utilize correct quantities based on the scenario, and its Total Evaluated Price therefore could not be utilized in the price reasonableness evaluation that the BET was conducting on Total Evaluated Prices.

Based on all of its analysis—including the aforementioned consideration of Total Evaluated Prices as well as the BET's "cross walking" of offerors' proposed unit prices to their price lists "to determine that the IDIQ unit prices were equal to or lower than the Offerors price list" (*see id.* at AR12033)—the BET found that the prices of CGI, Carahsoft, Mythics, and Savantage were reasonable, and that it could not determine the reasonableness of ██████s and ██████ prices.  (*Id.* at AR12043.)

The record thus does not support Savantage's assertion that DHS failed to consider Total Evaluated Price in evaluating price reasonableness.  Accordingly, even if the RFP and FAR limited DHS's discretion by requiring it to evaluate Total Evaluated Price for reasonableness, Savantage's argument must be denied.

### 2.    Competitive Published Price Lists

Savantage next argues that DHS "purportedly" utilized a price analysis technique in FAR 15.404-1(b)(2)(iv)—"[c]omparison with competitive published price lists"—but instead used price lists that were not "published" and did not determine whether they were "competitive." (Pl. MJAR at 25-28.)

As an initial matter, Savantage supposes DHS was far more constrained in its conduct of the price reasonableness evaluation than the RFP and the FAR dictate.  The Federal Circuit has made clear that "contracting agencies enjoy wide latitude in conducting" the evaluation of price reasonableness.  *DynCorp Int'l, LLC*, 10 F.4 at 1311.  "After all, the point of a price reasonableness analysis is to protect the public from paying a price that is too high for what is being procured.  And what exactly is 'reasonable' is a judgment based on the specifics of the government's needs."  *Id.*; *see also Vectrus Sys. Corp. v. United States*, 154 Fed. Cl. 29, 48 (2021) ("[T]he depth of an agency's price reasonableness analysis and its ultimate findings on that count are both matters of discretion.").

That discretion stems in part from the fact that the FAR is permissive in allowing an agency to fashion procedures to analyze prices for reasonableness.  FAR 15.404-1(b)(2) states that "[t]he Government may use various price analysis techniques and procedures to ensure a fair and reasonable price" and lists "[e]xamples" of price analysis techniques that the Government "may" use in subparagraphs (i) through (vii) (including "[c]omparison with competitive published price lists").  Nothing in FAR 15.404-1 indicates that an agency *may only* use the items in the list of examples—to the contrary, it states that price analysis techniques "include, but are not limited to" those listed in subparagraphs (i) through (vii).  FAR 15.404-1(b)(2).  The Federal Circuit has confirmed that FAR 15.404-1(b)(2) is permissive.  *See DynCorp Int'l*, 10 F.4th at 1311 (noting that FAR 15.404-1(b)(2) "states the government 'may use various price analysis techniques and procedures to ensure a fair and reasonable price'" and that "*May* denotes the permissive"); *see also IAP World Servs., Inc. v. United States*, 153 Fed. Cl. 564, 570 (2021) (stating that FAR 15.404-1(b)(2) "provides a non-exhaustive list of exemplar price analysis

techniques, none of which is mandatory").  Accordingly, DHS was not required to pick one of the FAR 15.404-1(b)(2) examples of price analysis techniques, as Savantage seems to assume.

Against this backdrop, Savantage fails to establish its premise that DHS purported to—or was otherwise required to—utilize FAR 15.404-1(b)(2)(iv) in evaluating pricing.  Savantage's citation to the Administrative Record for this proposition, "Tab 91 at AR12209," makes no reference to reliance on FAR 15.404-1(b)(2)(iv) or "competitive published price lists."  Nor did the RFP commit DHS to utilize FAR 15.404-1(b)(2)(iv) or "competitive published price lists."  Savantage has not established that DHS's price evaluation was required to strictly adhere to FAR 15.404-1(b)(2)(iv).

Further, Savantage's argument that DHS had to perform some sort of analysis to determine whether price lists provided were "competitive" and "published" lacks any basis in the RFP.  The RFP instructed offerors to include pricing from either a current GSA contract price list or a commercial catalog, as well as their proposed discounts off of that GSA contract or commercial pricing in the Attachment J-2 pricing spreadsheet.  (Tab 68 at AR10027, AR10031.)  It also instructed to "provide a copy of the GSA contract price list or commercial catalog as appropriate to validate proposed pricing."  (*Id.* at AR10031.)  The RFP did not instruct offerors to submit information to validate the "competitive" status of their GSA contract/commercial catalogs or to prove that commercial catalogs were "published."  And the RFP did not state that GSA contracts/commercial catalogs would be evaluated with respect whether they were "competitive" or "published."  DHS thus was not required to conduct such an evaluation.

Moreover, Savantage has waived any argument that DHS was required conduct such an evaluation.  The RFP made clear that the price evaluation would include comparison of proposed

prices to either GSA contract or commercial catalog prices, as it instructed offerors to "provide a copy of the GSA contract price list or commercial catalog as appropriate **to validate proposed pricing**."  (*Id.* at AR10031 (emphasis added).)  But the RFP patently did **not** require submission of evidence that price lists were "competitive" or "published," and the RFP nowhere indicated DHS would evaluate those aspects of the submitted price lists.  The "error" that Savantage alleges in the procurement was thus apparent on the face of the Solicitation—that DHS would not evaluate whether price lists were "competitive" and "published."  Defects in the solicitation, of course, must be challenged prior to the time set for receipt of proposals. *See Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1313-15 (2007).

Finally, even if DHS was required to utilize FAR 15.404-1(b)(2)(iv), Savantage fails to show that the provided price lists were not "competitive" or "published."  For example, Savantage suggests that Mythics' commercial price list is not "competitive" because a single line item in Mythics' commercial price list has a higher price than a line item that bears a different part number[15] in a different price list that Savantage appears to have pulled from an internet search.  (Pl. MJAR at 26 n.9.)  This paltry showing, based on a comparison of a single item in one price list to a single item in another price list—a comparison of two different items with different product numbers, no less—proves nothing at all.  It certainly does not demonstrate that the price list of thousands of items that Mythics provided with its proposal is not "competitive."

Additionally, Savantage fails to demonstrate that the price list Savantage appears to have found on the internet was considered by DHS in evaluating Mythics' proposal here.  It is outside

---

[15] Savantage compares the price for ███████████████ in Mythics' price list to ██████████████████ in a price list found on the internet.  (Pl. MJAR at 26 n.9.)

████████████████████████████████
███████████████████████

the Administrative Record, Savantage has not moved for supplementation of the Administrative

Record.  The Court therefore cannot consider it in making judgment on the Administrative

Record.  *See, e.g.*, *Axiom Resource Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379-80 (Fed.

Cir. 2009) (noting that "the focal point for judicial review should be the administrative record

already in existence, not some new record made initially in the reviewing court").

Savantage similarly fails in its attempt to establish that Mythics' price list was not

"published."  Savantage merely argues that Mythics' price list "bears no indicia of having been

published" and "bears no resemblance to" a different price list that Savantage claims to have

found on the internet.  (Pl. MJAR at 27.)  As noted, the RFP did not instruct offerors to supply

proof, or "indicia," of publication.  It is not apparent what the price list's "resemblance" to a

price list Savantage found on the internet has to do with whether it is "published."  And, again,

Savantage does not show that DHS considered, or had to consider, the price list Savantage found

on the internet when evaluating Mythics' proposal, and the Court should not consider it.  In sum,

Savantage cites to nothing on the face of Mythics' commercial price list that indicates it is not an

acceptable price list under the RFP's terms.

Accordingly, Savantage's challenge to the price reasonableness evaluation must either be

denied as an untimely challenge to the RFP's terms or because the RFP cannot reasonably be

read to restrict DHS's broad discretion in conducting its price reasonableness evaluation, as

Savantage contends.

**C.      The Agency Reasonably Evaluated Savantage's Proposal Under Factor 2, Functional Capability in Accordance with the Solicitation**

Savantage claims the Agency improperly applied unstated evaluation criteria when evaluating Savantage's proposal under Factor 2, Functional Capability.  (*See* Pl. MJAR at 35-40.)  Specifically, Savantage claims the Agency improperly treated a proposed software as not "██████ if the any of the proposed modules are: (1) separate products, (2) from separate companies, (3) on different platforms, or (4) separately licensed, which, Savantage claims, was inconsistent with the Solicitation's definition of "█████       (*Id.* at 37-38.)

To prevail on an argument that an agency used an unstated evaluation criterion, Savantage must show that: "(1) the agency used a significantly different basis in evaluating its proposals than was disclosed and (2) that the protestor has been prejudiced as a result." *Banknote Corp. of Am. v. United States*, 56 Fed. Cl. 377, 387 (2003), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004).  Savantage has not met this standard.

The Solicitation defined "█████       as a:

> Connection between two or more software ***modules***, typically part of the same system.  Connectivity is transparent to end users and maintained as part of a software offering. The system is considered ***tightly coupled***.  There is ***no software development required*** to build these connections and they do not require operations and maintenance support under a sustainment contract. Updates are provided by the OEM vendor.

(Tab 27d at AR6412.)  In contrast, the Solicitation defined "█████      as a:

> Connection between two or more software ***systems*** used to synchronize information.  The systems involved are loosely coupled and the interfaces may require ongoing maintenance to support change to the underlying systems.  ***Data is typically stored in multiple systems.***  These ***connections are often custom created***

during the software implementation and may require ongoing
operations and maintenance support under a sustainment contract.

(*Id.* (emphasis added).)

Savantage points to no aspect of the Agency's evaluation amounts to "a significantly different basis in evaluating its proposals than was disclosed." The record demonstrates the Agency did not apply unstated evaluation criteria but instead logically compared and contrasted Savantage's proposed software to the definition of "████████ and "████████ and reasonably determined Savantage's proposed software ████████████████████████ ████████ (*See* Tab 89 at 12170-80.) Savantage myopically focuses on a single sentences within the Agency's evaluation while ignoring the context of the sentence and the entire contents of the evaluation therein.

For instance, Savantage claims the Agency unreasonably concluded its solution was ███ ████████ because its ████████████ was ██████████████████████ ████████████████████████████████████████████████████████████. (Pl. MJAR at 38.) Savantage claims there is "no clear nexus" to the express language of the Solicitation which defined "████████ as a "connection between two or more software modules, ***typically*** part of the same system." (Pl. MJAR at 39 (citing Tab 27d at AR6412) (emphasis added).)

As explained in the record, "[t]he Government's reference to the fact that Savantage's proposed software (████████████████████████████████) is ████████ ████████████████████████████████████████████████. Rather, the reference to ██████████████ is meant

███████████████████████████████████████████████
█████████████████████████████████

to demonstrate or make the point that Savantage's software solution ████████████ ████████████████████████████████████████████████████████████████.″ (Tab 89 at AR12170 (emphasis added).)  The Agency reasonably concluded that "[d]espite the terminology used by Savantage, ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████. ████████ ████████████████████████████████████████ may be ████████████████████████████ ████████████████████████████████████████████████████. However, this ████████████████████████████████████████████████████. This would be considered ████████████████████████████████████████ per the EFiMS SOW but does not meet the definition of ████████ (Tab 89 at 12177 (emphasis added).)

In short, while it may disagree, Savantage has not met its burden of proving that the Agency's decision to assess a deficiency based on Savantage's failure to provide '████████████ software was unreasonable.  Further, the argument that doing so resulted in the application of an unstated evaluation criterion cannot be squared with Savantage's proposal itself which reflects demonstrates its solution consisted of ████████████████████████████████ (████████████)[16] and where Savantage does not deny that ████████████████████████ ████████████████████████████████████████ Savantage's argument, at best, is a challenge to the solicitation's terms, if not another failed attempt to re-draft the Solicitation to

---

[16] *See* Tab 89 at AR12168 (TET finding: "Connectivity spans across multiple systems (████████ ████████████████ and different platforms (████████████."); Tab 51a at AR8241-43 (Savantage's proposal explaining that ████████ is "developed using the ████████████████" while ████████ "is a secure business process management software platform built on ████████ technology.").

████████████████████████████████████████████████████████
████████████████████████████████████████

its liking.  *See Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1286 (Fed. Cir. 2010)

("[C]ompetitors do not dictate an agency's minimum needs[.]") (citation omitted).  And asking

the Court to determine whether Savantage's proposal was "███████" versus "███████"

involves a judgment that is quintessentially the Agency's to make.

The record shows the Agency did not employ unstated evaluation criteria and the Court

should decline Savantage's invitation to second-guess the Agency's well-documented and

rationale decision regarding the merits of Savantage's proposal.

### D.     The Agency Fairly Applied the Same Evaluation Criteria to All Offerors Under Factor 2

Savantage claims the Agency engaged in disparate treatment because Mythics, and the

other awardees, were not equally downgraded even though they too allegedly lacked

"███████" (Pl. MJAR at 41.)  With respect to Mythics, Savantage claims it was improperly

downgraded based on the Agency's inaccurate assumption that █████████████████

█████████████████ would not be tied together" and the Agency engaged

in disparate treatment because Mythics' proposal indicates that it █████████████, yet

Mythics still received a rating of ███████."  (*Id.* at 43.)  Savantage also claims the

Agency engaged in disparate treatment because it was improperly downgraded for not having

███████" and Mythics was not even though Mythics' proposal includes "several

references to ███████" and therefore. does not have "███████."  (*Id.*)

As an initial matter, Savantage's contentions are based on a misreading of the record.

First, the record demonstrates the crux of the Agency's concern was not the fact that Savantage

███████████████████████

███████████████

proposed the use ▉▉▉▉▉▉▉.  Instead, the record demonstrates the Agency's concern was due to a lack of detail.  Specifically, the Agency found that:

> Savantage ***does not provide detail*** on whether ▉▉ ▉▉▉▉▉▉▉, ▉▉▉▉▉▉▉▉▉▉▉▉▉, would have ▉▉▉▉▉▉▉▉▉▉▉ or a ▉▉▉▉▉▉▉▉▉.  There is ***no detail*** provided on how ▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉) would be ▉▉▉▉▉ and how the Government would reconcile. There is ***no detail*** on how ▉▉▉▉▉▉▉▉▉▉▉▉▉ can be ▉▉▉▉▉▉▉▉▉▉.

(Tab 89 at AR12173 (emphasis added).)

The record also demonstrates that the Agency's other concern related to Savantage's lack of ▉▉▉▉▉▉▉▉ did not stem from the use of ▉▉▉▉▉▉" as Savantage proclaims.  (Pl. MJAR at 43.)  Instead, the evaluation record demonstrates the basis of the Agency's concern stemmed from the fact that "Savantage proposed software products, including ▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉, operate on ▉▉▉▉ ▉▉▉▉▉▉▉."  (Tab 89 at AR12172.)  The Agency's concern was that ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉."  (*Id.* (emphasis added).)

Notwithstanding, for Savantage to prevail on its disparate-treatment claim, its proposal must have been "'substantively indistinguishable' or nearly identical" to Mythics' proposal.  *See Office Design Grp.*, 951 F.3d at 1372.  The record demonstrates that Savantage's disparate treatment claim is meritless as Mythics' proposal was substantively distinguishable from Savantage's proposal.

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

First, Mythics proposed an entirely different solution than Savantage.  Mythics proposed using ███████████████████████████ of software (Tab 84a, ECF No. 26-12 at 466 of 1769) whereas Savantage proposed █████████████.  (Tab 86a at AR11933.) Consequently, the differences in evaluations stemmed from the differences in the proposed software solutions.

With respect to █████████████,” Mythics explained in its proposal that ████████ ██████ “is built on a ██████████████████, which means that integration between the functional areas is an inherent, fundamental part of the solution.”  (Tab 84a, ECF No. 26-12 at 466 of 1769 (emphasis added and omitted); *see also* Tab 91 at 12239 (“Mythics highlighted that ████████████████ have one set of data and form an integrated business flow to reduce manual intervention.’”)).  Mythics even provided an example of how the ████████████ is used by finance and procurement that “…***minimize[es] the need to*** ████████████████████████.” (Tab 84a, ECF No. 26-12 at 472 of 1769 (emphasis added); *see also* Tab 89 at AR12096.)  In contrast, Savantage did not propose a solution that ███████████████████████████████ Instead, Savantage proposed ███████████████████████████████ ████████████████████████████.

Mythics fully explained that because of ███████████████████████ this “ensures that accurate accounting is generated for each step then ████████████████████ ██████”  (*Id.* at 468.)  Mythics’ proposal further stated that ‘████████████ the procurement process with ████████████, the accounting ████████████████, and the financial budget ████████████████” and that agencies “can obtain funding reports and inquiries from the financial

████████████████████████████████████████████
████████████████████████████████

system." (*Id.* at 480.)[17]  Savantage's proposal did not provide the level of detail and explanation

on ███████████████████████████████ as compared to Mythics' proposal.

These proposals, therefore, were not identical or nearly so, and the Agency was entitled

to treat each one distinctively on its own strengths and weaknesses, as it in fact did.

Consequently, Savantage's disparate treatment claim fails.

### E. The Agency's Evaluation of Savantage's Proposal Under Factor 2 was Based on a Plain Reading of Savantage's Proposal

Savantage argues that the Agency's evaluation of its proposal under Factor 2 lacks a

rational basis because several of the Agency's conclusions are premised on "factually incorrect

determinations."  (Pl. MJAR at 44.)

In such matters as technical evaluations, courts defer to an agency's expertise because the

agency is better situated to make those determinations.  *Kinemetrics, Inc. v. United States*, No.

21-1626, 2021 WL 4237169, at *7 (Fed. Cl. Sept. 10, 2021); *Squire Sols., Inc. v. United States*,

No. 21-1494C, 2021 WL 4805540, at *14-16 (Fed. Cl. Sept. 30, 2021) (declining to second-

guess an agency's technical evaluation involving discretionary determinations in a technical

BAA).  "This deference is heightened for cases involving highly technical subject matter."  *Red*

*Cedar Harmonia, LLC v. United States*, 144 Fed. Cl. 11, 22 (2019).

---

[17] Mythics proposal further stated that: "The ████████████████████████ has a linked document chain in an integrated business flow; █████████████████████ and █████ which feed data to ████████████, which provide data ████████ . This process is integrated with ████████████ for ██████████████████████ and ██████████████████ (i.e., ███████████████████████████). When an agency procures a ████ ██████████████ , the asset record, including physical attributes, financial attributes, and value, can be ███████████████ and ████████████ on the ████████████████████████████ (Tab 84a, ECF No. 26-12 at 464.)

████████████████████████████████████████████████

████████████████████████████████████

On the record before the Court and reasonable inferences therefrom, Savantage has not

met its burden to show that the Agency's evaluation was arbitrary and capricious.  To the

contrary, the record demonstrates that the Agency provided a detailed review and explanation for

each of its conclusions related to Savantage's proposal.  The Agency's evaluation includes pages

of review and detailed connections between the facts found and conclusions drawn.  The record

demonstrates the Agency rationally concluded that Savantage's proposed software more firmly

met the definition of " ███████     instead of " ███████

**1.      The Agency's Conclusion that Savantage's Modules ███████**
**███████                    Was Reasonable**

Savantage claims the Agency erred when it found that Savantage's proposed software ███

███████.  (Pl. MJAR at 45-46.)  However, Savantage's own proposal

stated that ███████ require ███████.  (Tab 55c

at AR 9563.)  Savantage's proposal included a table separately listing the minimum number of

licenses needed ███████.  (*Id.*)  Furthermore, Savantage's price list

included different items and prices ███████ (*Id.* at AR9616.)

On this record, Savantage cannot meet its burden of proving that the Agency's evaluation of

Savanatage's proposed ███████ was unreasonable.

**2.      The Agency's Conclusion that Savantage's Software Modules ███**
**███████ Was Rational**

Savantage claims the Agency ignored the assertions made in its proposal which, it

alleges, demonstrates its software system is " ███████."  (Pl. MJAR at 46-47.)  Not so.

The record demonstrates the Agency reviewed each of the points that Savantage asserts

supports its claimed " ███████ " software, but nonetheless concluded that these each of the

███████
███████

49

areas identified by Savantage logically correlate to the definition of "█████████ not

"█████████ (*See* Tab 89 at AR12173.)  As explained by the Agency:

> The need to █████████ is not satisfied by █████████
> that brings together data █████████ ████████████████. The
> expectation is the system makes use of data, terminology, services,
> and technology across the system. The data would be expected to be
> █████████████████████ and the system would be expected to
> █████████████████. If issues occurred during a data
> exchange, █████████████████ would have mechanism to
> address any issues that occurred. A ████████████████, as the
> █████████████████████, would store data ████████████
> █████████████████████████████████████████████████
> Data exchanges in such systems are █████████████████████
> █████████████████ data sets.

(*Id.* at AR12178.)  Notably, nothing in Savantage's proposal indicates that its █████████

██████████████████████.  Instead, Savantage's proposal states that its ████

█████████████████████████████████████████ (Tab 86a at

11943.)  To demand that the Agency evaluate protestor's technical proposal as if it did not plan

on using █████████████████████ second guess the Agency's

technical evaluation, which the court should not do so.  *See E.W. Bliss Co. v. United States*, 77

F.3d 445, 449 (Fed. Cir. 1996) (citing *Lockheed Missiles & Space Co. v. Bentsen*, 4 F.3d 955,

958 (Fed. Cir. 1993)).

### 3. The Agency Rationally Concluded that the Connections Between Savantage's Software Solutions Requires █████████████████ ██████████████████████

Contrary to Savantage's claims, the Agency rationally concluded that the connections or

interfaces between Savantage's ████████████████████████████████████████

█████████████.  (Pl. MJAR at 48.)  The record demonstrates the Agency provided an

explanation as to why "███████████████████████████████
█████████████████." (*Id.*)  In this regard, the Agency explained that:

> The fact that Savantage may ███████████████████
> █████████████████████ Government will need to
> support all systems in our operating environment under operations
> and maintenance support contracts. ███████████████
> ████████████████████ This includes databases, operating
> systems, and the application code. The Government will also be
> responsible for ensuring that any interfaces between the two systems
> remain operational. ████████████████████████
> ████ ████ ████ ██ ████████ ██ ████
> ████████████████████████████████████
> ████ Section 1, the EFiMS SOW calls out the need for commercial
> off-the-shelf (COTS) software to provide integrated financial
> management, procurement, and asset management. The stated key
> success factors on page 10 of the EFiMS SOW are the reduction of
> customization and manual workarounds. ████ ████ ████
> ███████, ████████████████████, goes against these key
> success factors and ███████████ the definition of █████████ per the
> EFiMS SOW.

(Tab 89 at AR12179; *see also id.* at AR12173 ("████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
████████████.").)

Moreover, Savantage's proposal did not claim it ███████████████████
███████████████████████████████. (Pl MJAR at 48.)  Instead,

███████████████████████████████████████████
█████████████████████████

Savantage's proposal ambiguously stated ███████████████████████████████

████████████████████████████████ (Tab 89 at AR12179 (quoting Tab 51a at

AR8251).)  Nothing in Savantage's proposal indicated Savantage would be responsible for

████████████████████████████████████████████████████████████.  Indeed,

"[o]fferors carry the burden of presenting 'an adequately written proposal, and an offeror's mere

disagreement with the agency's judgment concerning the adequacy of the proposal is not

sufficient to establish that the agency acted unreasonably.'"  *Software Eng'g Servs., Corp. v.

United States*, 85 Fed. Cl. 547, 554 (2009) (quoting *United Enter. & Assocs. v. United States*, 70

Fed. Cl. 1, 26 (2006) (citation omitted).)  It was the obligation of Savantage to make clear that it

would be responsible for ████████████████████ provide sufficient detail is

chargeable to it alone.  Accordingly, Savantage has not proven it was unreasonable for the

Agency to conclude that "[t]he ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████."  (Tab 89 at AR12179.)

### F. The Agency's Evaluation of Offerors' Proposal under Factor 1, Experience was Reasonable and in Accordance with the Solicitation

For Factor 1, Experience, Savantage claims the Agency engaged in disparate treatment

because "none of the Awardees can show that their proposed fully integrated software was

implemented at an agency similar to DHS.  Thus, the Agency treated Savantage unequally by

failing to assign the Awardees weaknesses on this issue."  (Pl MJAR at 49.)  With respect to

Mythics, Savantage claims the Agency engaged in disparate treatment because "Mythics'

proposal provides examples of agencies that currently or have previously implemented some of

████████████████████████████████████████████████████████████

████████████████████████████████████

████████████████████, but fails to provide any examples where the ████████████████████

Mythics proposed in response to the Solicitation has been implemented together at an agency

similar to DHS."  (*Id.* at 50-51.)

Savantage cannot meet the standard for demonstrating a disparate treatment claim.  As

the Court of Appeals for the Federal Circuit held in *Office Design Group v. United States*, to

prevail on a disparate treatment claim a protestor must show "that the agency unreasonably

downgraded its proposal for deficiencies that were 'substantively indistinguishable' or nearly

identical from those contained in other proposals."  951 F.3d at 1372.

Applying the standard set forth in the *Office Design Group*, Savantage's experience is not

"substantively indistinguishable" from Mythics' experience as each offerors' experience

involved different contracts, with different agencies, and the use of different software products.

*Compare* Tab 84a, ECF No. 26-12 at 461-463 (Mythics' Experience) *with* Tab 86a at AR11933-

35 (Savantage's Experience).  Specifically, Mythics' proposal included three examples ████████

████████████████████) and the Agency reasonably concluded these references ████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████"  (Tab 89 at

AR12088 (emphasis added); *see also* Tab 84a, ECF No. 26-12 at 465-466.)  In contrast,

Savantage only provided ████████████████████ where both the ████████████████████

████████████████ implemented.  (Tab 86a at AR11934.)  However, the Agency concluded

that "████████████████████████████████" and therefore, "████████████████

████████████████████████████████████████████████████."  (Tab 89 at

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████

AR12152 (emphasis added).)  The Agency rationally considered the different aspects of each reference and, within its reasonable discretion and assigned the appropriate ratings.

Savantage has failed to demonstrate that its proposal met the foundational requirement for a disparate treatment claim—specifically, that its proposal was substantively indistinguishable from Mythics.  *Office Design Grp.*, 951 F.3d at 1372.  It would therefore be inappropriate for the court to engage in a review of the agency's conclusions, as such review would involve "second guessing of 'minutiae' " that is outside the purview of this court.  *Enhanced Veterans Sols., Inc. v. United States*, 131 Fed. Cl. 565, 588 (2017).

### G.   The Agency's Evaluation Under Factor 4, Past Performance was Reasonable and in Accordance with the Solicitation

Savantage claims the Agency's evaluation under Factor 4, Past Performance was unreasonable because, in the prior competitive range evaluation, Savantage was awarded a '███████████████" rating because it only provided past performance for ███████████ ████████████████████████████████████████████ separately rather than past performance for the implementation of the two systems together.  (Pl. MJAR at 51.)  Similar to its argument related to Factor 1, Savantage claims because none of the awardees could have provided experience implementing a single integrated financial, procurement, and asset management system that was implemented under one contract at a federal agency with at least 6,500 users, then, they too could not have met the requirement under Factor 4, Past Performance. (*Id.* at 51-52.)  This complaint is without merit for multiple reasons.

First, the record demonstrates that the Agency's initial deficiency related to Savantage's

████████████████████████████ as a single software offering, was subsequently

removed.  (*See* Tab 87 at AR12002; *see also* Pl. MJAR at 51 (acknowledging that this

assessment was made in its "prior competitive range evaluation").)  Instead, the record

demonstrates, that during the final evaluation, the PPET's confidence did not increase and

Savantage's rating remained ███████████ because, although Savantage subsequently

provided its experience with ████ which included the implementation of ████████

████████, the Agency nonetheless concluded that "████████████████

████████████████████████████████████████

████████████████████████████." (Tab 87 at

AR12002; *see also* Tab 91 at AR12240.)  Because the evaluation finding Savantage complains

about was subsequently removed from the Agency's evaluation, and instead it was the ████████

████████████████ that ultimately led to the "███████████" rating - a finding

Savantage does not challenge, Savantage's challenge fails.

 Notwithstanding, the record demonstrates the Agency's evaluation of Mythics' past

performance was reasonable and in accordance with the Solicitation and not a result of disparate

treatment.  The record shows for Factor 4, Mythics included its DHS and the Department of State

contracts where it ████████████████████ and the Agency reasonably concluded that

these "contracts are relevant to the size, scope and complexity of the EFiMS."  (*See* 84a, ECF

No. 26-12 at 540-44; *see also* Tab 60 at AR9751.)

 Even if the Court were to find that the Agency engaged in disparate treatment, which it

did not, Savantage cannot demonstrate how it was prejudiced since Savantage received the same

████████████████" as Mythics rating in the Past Performance factor.  (Tab 89 at AR12048.)

████████████████████████████████████████████

    ████████████████████████████

### H.      Best Value Determination

Savantage argues that DHS's best value determination was tainted by the allegedly

flawed evaluation of proposals.  (Pl. MJAR at 54.)  Because Savantage fails to demonstrate flaws

in the evaluation, as discussed above, this argument fails as well.

Savantage also argues that the best value selections of Mythics and CGI were contrary to

the RFP's statement that "the Government will not make an award at a s███████████████

███████████  to the Agency to achieve ███████████████████████"  (*See* Tab 68 at

AR10028.)  But Mythics and CGI were not found to have "██████████████████████

█████████" in comparison with Savantage.  Rather, they were found to have "███████████

██████████████████" over Savantage that warranted their selection as better values ███████

█████████████████.  (*See* Tab 92 at AR12266-67.)  Accordingly, the RFP's statement

about achieving "████████████████████████████" did not apply to Mythics' and CGI's

tradeoffs with Savantage.

But Savantage does not complain about Mythics' and CGI's tradeoffs with it.  Rather,

Savantage oddly complains about Mythics' and CGI's tradeoffs with ***Carahsoft***.  Savantage

argues that the RFP precluded award to Mythics and CGI because they had ███████████████

█████ than ***Carahsoft*** and were ███████████████████ ***Carahsoft***.  (Pl. MJAR at 52-54.)

Carahsoft was, in fact, selected as an awardee.  (Tab 92 at AR12270.)  That is, Savantage's

position is that the RFP required DHS to consider offerors' competitive standing relative to

*awardees*, rather than to their competitors for additional awards.

Again, Savantage has lost sight of the context.  The RFP's statement that "the

Government will not make an award at a significantly higher overall cost to the Agency to

achieve only slightly superior technical capability" is situated in an RFP paragraph that primarily provides that "[a]ward will be made the offeror(s) whose proposal is determined to represent the best value, price and non-price factors considered."  (Tab 68 at AR 10028.)  That RFP paragraph then clarifies that this means the agency could select a higher-priced proposal if its technical proposal represents the best value, though DHS would not select as best value a "significantly higher overall cost" proposal "to achieve only slightly superior technical capability."  (*Id.*)  The point of this typical, straightforward language is that awards will be made using the commonplace "best value tradeoff" methodology that permits the Agency to conduct judgmental tradeoffs between price and non-price factors to determine best value (as opposed to automatically selecting the lowest-price, technically acceptable offerors, for example), with a warning to offerors that, in a tradeoff, a proposal with slightly superior technical capability will not be found the better value if it has a significantly higher cost.

Nothing in this language indicates that the tradeoff between two offerors for one of the multiple awards would be affected by the relative price and technical capabilities of *a third party awardee*.  That is, that ***Carahsoft*** ████████████████████████████ Mythics and CGI had no bearing on DHS's tradeoffs between ***Mythics and Savantage*** and between ***CGI and Savantage***.  Savantage's interpretation that the RFP precluded award to Mythics and CGI—even though DHS found ████████████████████████████—would require DHS to select an offeror that is not the best value.  This absurd result would be contrary to the RFP, which plainly called for the awards to be made to the best-value offerors.  Savantage's interpretation is unreasonable and must be rejected.

████████████████████████████████████████████████
████████████████████████████████

## II.     Plaintiff Is Not Entitled to Any Injunctive Relief

The Court considers four factors when determining whether to grant permanent injunctive relief: (1) success on the merits; (2) irreparable injury to the moving party absent injunctive relief; (3) the balance of that harm against any harm injunctive relief will cause the Government or other parties; and (4) the public interest.  *See, e.g.*, *PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004).  For the reasons discussed above, Savantage has not demonstrated that DHS's evaluation of proposals and award decisions involved any prejudicial errors, and therefore has not satisfied the indispensable element of success on the merits.  The Court should therefore deny an injunction.  *See, e.g.*, *id.* (noting that a plaintiff "must" succeed on the merits before the court may grant a permanent injunction); *see also Crowley Tech. Mgmt., Inc. v. United States*, 123 Fed. Cl. 253 (2015) (stating that the plaintiff's request for injunctive relief must be denied because it did not succeed on the merits).

## <u>CONCLUSION</u>

For the reasons stated above, Mythics respectfully requests that the Court deny Plaintiff's Motion for Judgment on the Administrative Record and grant Mythics' Cross-Motion for Judgment on the Administrative Record.

Dated: December 21, 2021                    Respectfully submitted,

                                            **HOLLAND & KNIGHT LLP**

                                            <u>s/ David S. Black by s/ Gregory R. Hallmark</u>
                                            David S. Black, Esq.
                                            (Counsel of Record)
                                            1650 Tysons Boulevard, Suite 1700
                                            Tysons, VA 22102
                                            Phone: (703) 720-8680
                                            Facsimile: (703) 720-8610
                                            E-mail: david.black@hklaw.com

                                            *Counsel for Mythics, Inc.*

Of Counsel:

Gregory R. Hallmark, Esq.
Amy L. Fuentes, Esq.
1650 Tysons Boulevard, Suite 1700
Tysons, VA 22102
Email: gregory.hallmark@hklaw.com
Email: amy.fuentes@hklaw.com

Hillary J. Freund, Esq.
Holland & Knight LLP
800 17th Street N.W., Suite 1100
Washington, D.C. 20006
E-mail: hillary.freund@hklaw.com